NOV 24 2025 PM3:19
FILED - USDC - FLMD - ORL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

Michael Friedmann,

                    Petitioner/Plaintiff,

Federal Trade Commission, National
Association of Attorneys General, State of
Washington, Attorney General of the State of
Washington, Robert Ferguson, *in his official and
individual capacity;* David Horn, *in his official
and individual capacity;* Joshua Studor, *in his
official and individual capacity;*

              Respondents/Defendants.

CASE NO.:

CIVIL COMPLAINT FOR DAMAGES

[JURY TRIAL DEMANDED]

## I. CIVIL COMPLAINT AND INTRODUCTION:

COMES NOW Plaintiff Michael Friedmann ("Plaintiff"), proceeding **Pro Se**, bringing this civil action against Defendants Federal Trade Commission ("FTC") and National Association of Attorneys General ("NAAG"), and the State of Washington, and the Office of the Attorney General of Washington State, and Robert Ferguson, and David Horn, and Joshua Studor, and alleges as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Background:** Plaintiff Michael Friedmann was the former and sole owner of Fallen Hero Bracelets, LLC, a Washington-based, minority-owned small business that sold memorial bracelets and related merchandise to honor fallen U.S. service members, while also owned several other businesses, to include a tobacco business that sold cigars, and a Federal Firearms Licensee Business selling firearms (which is the reason he was targeted by Robert Ferguson). His marketing informed customers that a portion of proceeds would benefit veterans' charities. In 2018, federal and state authorities (the FTC, NAAG, and the Washington State AG) targeted Plaintiff's business as part of "Operation Donate With Honor," branding it a "sham charity" and obtaining injunctions that effectively barred him from selling goods tied to charitable solicitations. Plaintiff alleges multiple constitutional and tort claims based on these actions. Below we address each cause of action, showing why the government's conduct violated federal and state law.

**Shocking to the Conscience Standard and Pattern of Abuse**

The conduct of the State of Washington, through the Office of the Attorney General and its named representatives, rises to a level that is "shocking to the conscience" under the standard articulated by the U.S. Supreme Court in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). Government conduct that is arbitrary, capricious, or intended to oppress individuals without legal justification violates the core tenets of substantive due process. The Plaintiff in this case was subjected to an unprecedented, warrantless intrusion into his private financial records and business dealings—devoid of any judicial oversight or procedural safeguards. The State's agents accessed all Plaintiff's banking institutions, business affiliations, and financial operations in what amounted to an extrajudicial fishing expedition under color of law. This deliberate and unjustified abuse of power resulted in the decimation of the Plaintiff's livelihood and reputation. Courts have consistently held that official conduct that results in deprivation of liberty or property interests without due

process is actionable under 42 U.S.C. § 1983 when it shocks the conscience, as was the case here.

**Comparative Analysis: Value Village and Selective Enforcement**

The State of Washington pursued a similar, now publicly discredited, course of litigation against the corporate entity operating Value Village, alleging deceptive advertising under the Washington Consumer Protection Act (CPA). In *State v. TVI, Inc. d/b/a Value Village*, No. 97104-0, the Washington Supreme Court held in 2021 that Value Village's advertising was protected under the First Amendment and that the State's action constituted an overreach that failed to consider constitutional protections. Notably, Value Village was equipped with the legal representation necessary to challenge the State's expansive and unconstitutional application of the CPA.

In stark contrast, the Plaintiff in this case, an individual and small business owner, lacked access to legal counsel due to the reputational and financial destruction caused by the Defendants' actions. The State, aware of this vulnerability, exploited it to advance litigation that mirrored the Value Village theory, without affording the Plaintiff any meaningful opportunity to defend himself. This disparity in prosecutorial discretion and procedural fairness reveals a pattern of abusive enforcement tactics by the Attorney General's Office that not only disregards constitutional boundaries, but also operates in a politically discriminatory manner—targeting those who cannot defend themselves while sparing corporate actors with legal means to fight back.

By treating the Plaintiff as a political or ideological opponent and weaponizing investigatory authority to suppress his business, reputation, and access to justice, the Defendants collectively violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution. The legal outcome in the Value Village case

underscores that had the Plaintiff been similarly represented, the State's actions would have likely failed under judicial scrutiny.

1. This action arises from Defendants' coordinated investigation and enforcement actions targeting Plaintiff's lawful business operations under the guise of consumer protection and regulatory enforcement.

2. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, including unlawful search and seizure, denial of due process, and unconstitutional application of state law.

3. Plaintiff seeks compensatory and punitive damages for unlawful access to and seizure of his financial records and assets, reputational harm, and the destruction of his businesses, as well as declaratory and injunctive relief.

## II. JURISDICTION AND VENUE:

1. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States.

2. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to these claims occurred in the State of Washington.

3. **Subject Matter Jurisdiction:** This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) because Plaintiff's claims arise under the Constitution and laws of the United States, including the First and Fourteenth Amendments, **Bivens** implied causes of action for constitutional violations by federal actors, 42 U.S.C.

§§ 1983 and 1985 (civil rights statutes), and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiff seeks redress for the deprivation of civil rights. To the extent any claims arise under state law, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

4. **Sovereign Immunity – FTC:** Defendant FTC is an agency of the United States government. Plaintiff's tort claims against the FTC are brought under the FTCA, wherein the United States has waived sovereign immunity for certain tortious acts of federal employees committed within the scope of their employment. Plaintiff has exhausted all required administrative remedies under the FTCA by timely serving the FTC with a **Standard Form 95** notice of claim, more than six months prior to this suit. Jurisdiction is therefore proper under 28 U.S.C. § 1346(b)(1). To the extent Plaintiff raises constitutional claims (Bivens claims) against federal officers or employees of the FTC, such claims are not barred by sovereign immunity because they seek to hold individual federal actors accountable for constitutional violations in their individual capacities. Injunctive and declaratory relief are also sought against the FTC (and its officials) for ongoing violations of federal law, which is authorized under 5 U.S.C. § 702 and the general federal question jurisdiction.

5. **Sovereign Immunity – NAAG:** Defendant NAAG is an interstate association comprising the attorneys general of the 50 states, D.C., and U.S. territories. NAAG is not a federal agency or a state government, but rather a separate non-profit entity that coordinates state legal actions. As such, NAAG does not enjoy sovereign immunity as a state or federal sovereign. Even if any immunity could be asserted,

it would not shield NAAG's unlawful actions here, because NAAG and its members acted **under color of state law** (through state officials) and in concert with federal actors to violate Plaintiff's constitutional rights. Jurisdiction over NAAG is proper under 28 U.S.C. § 1331 (for Plaintiff's claims under 42 U.S.C. § 1983 and § 1985) and under the Court's supplemental jurisdiction for any state-law tort claims against NAAG.

6. **Venue:** Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiff is a resident of Florida (within the Middle District). The injuries to Plaintiff were suffered both in and outside this District, but within the continental United States, with injuries continuous and repetitive until as recent as October 17, 2025. Defendant FTC conducts business and enforcement activities in this District, and Defendant NAAG, through its member the Washington State Attorney General and its nationwide initiatives, directed activities into this District that gave rise to Plaintiff's claims. Therefore, both Defendants are subject to personal jurisdiction in Florida and venue in this Court is appropriate.

7. **Intradistrict Assignment:** This case may be assigned to the Tampa Division of the Middle District of Florida because the case arises out of Osceola County, where Plaintiff resides.

### III. PARTIES:

6. **Plaintiff:** Michael Friedmann is a natural person residing in Kissimmee, Florida. Plaintiff is a member of a minority group and proceeds in this action **pro se** on behalf of himself and his interests that have been harmed.

7. **Defendant Federal Trade Commission (FTC):** The FTC is an independent agency of the United States Government tasked with enforcing consumer protection and antitrust laws. It operates nationwide, including significant activities within Washington State. The FTC coordinated and led a nationwide initiative called **"Operation Donate With Honor"** targeting charities and businesses that solicit funds on behalf of veterans. At all relevant times, the FTC, through its officers, agents, and employees (including those in its Bureau of Consumer Protection and Western Region offices), acted under color of federal law and in joint action with state officials to commit the wrongful acts alleged herein. The FTC's principal office is in Washington, D.C., and it may be served with process through the U.S. Attorney for this District and the Attorney General of the United States, in accordance with Fed. R. Civ. P. 4(i).

8. **Defendant National Association of Attorneys General (NAAG):** NAAG is a nonpartisan, nonprofit organization with its principal offices in Washington, D.C. NAAG serves as a national forum and coordinating body for the attorneys general of the states and territories. NAAG, through its Charities Committee or other sub-groups, collaborated with the FTC in planning and executing Operation Donate With Honor. In doing so, NAAG acted under color of state law (by directing, encouraging, or assisting state officials, including the Washington State Attorney General, in enforcement actions) and jointly with federal actors. NAAG can be served via its executive director or an authorized officer at its headquarters address in Washington, D.C.

9.  Defendant State of Washington is a state of the United States.

10. Defendant Washington State Attorney General's Office is an executive agency of the State of Washington.

11. Defendant Robert Ferguson is the former Attorney General of Washington, sued in both his official and individual capacities.

12. Defendants David Horn and Joshua Studor are employees or agents of the Washington Attorney General's Office, sued in both their official and individual capacities.

13. **Additional Actors and Defendants(co-Conspirators):** Former Washington State Attorney General Robert Ferguson is a key participant in many of the events described, along with David Horn and Joshua Studor. Attorney General Ferguson, acting through the Washington Attorney General's Office, carried out enforcement actions in concert with FTC and NAAG as part of the alleged conspiracy. References to acts by NAAG or the "state" herein include acts by Attorney General Ferguson and his staff in furtherance of the joint Operation Donate With Honor initiative. Any conspiracy or joint action alleged includes Mr. Ferguson as an co-conspirator whose actions are attributed to Defendants for purposes of Plaintiff's claims under 42 U.S.C. § 1983 and § 1985.

## IV. STATEMENT OF FACTS:

14. Plaintiff operated legitimate businesses providing lawful services and products, including via online platforms.

15. Beginning in or around 2019 to 2020, Defendants initiated an investigation into Plaintiff's operations under the Washington Consumer Protection Act, with injuries to the Plaintiff as recently as October 17, 2025.

16. Without any judicial warrant or oversight, Defendants unlawfully accessed Plaintiff's banking and financial records from multiple institutions. Despite accessing such records which exonerated the Plaintiff of any wrong doing, the Defendant's conspired to exclude evidence, hide evidence, tamper with evidence, and use the information illegally obtained to attack the Plaintiff's business operations with false allegations, as well as attacking the Plaintiff personally.

17. Defendants further communicated with Plaintiff's business partners and clients, damaging reputations and relationships based on unverified accusations.

18. Financial accounts were frozen and assets seized without due process.

19. Plaintiff was never charged with a crime, never presented with a warrant, and never given an opportunity to confront his accusers or present exculpatory evidence. In fact, the Plaintiff made repeated efforts to obtain access to Due Process and defend himself but was denied all efforts by the State court. The Appeal filed in this matter was stalled again by the State of Washington, denying the Plaintiff any and all access to Due Process in direct violation of multiple Constitutionally protected rights.

20. Plaintiff's businesses were forced to close, and his reputation in the community was irreparably damaged. The Plaintiff has since lost four career-level jobs, as well as numerous relationships based upon press releases and false information

released by the Defendant's against the Plaintiff. With the most recent injury and loss of a career-level job occurring as recently as March 2025.

21. Defendants' actions mirror enforcement patterns used against minority and Republican-affiliated business owners, as seen in other high-profile targeting (e.g., Value Village).

**A. Background of Operation Donate with Honor and Conspiracy to Target Plaintiff:**

22. In July 2018, the FTC, together with NAAG and other state charity regulators, announced **Operation Donate with Honor**, a nationwide law enforcement and educational campaign. This campaign aimed to "crack down" on charities and businesses suspected of misleading donors by falsely claiming to help veterans and servicemembers. The FTC coordinated this effort across every state, working closely with state attorneys general and organizations like NAAG and the National Association of State Charity Officials (NASCO). The FTC publicly thanked NAAG and its Charities Committee for supporting and coordinating this initiative. Defendants used Operation Donate with Honor as a means to pool resources and plan simultaneous enforcement actions against targeted entities.

23. Plaintiff's became a target of Operation Donate with Honor. Plaintiff's company, **Fallen Hero Bracelets, LLC** ("FHB"), became a target of Operation Donate with Honor. FHB is a small, minority-owned business that from 2009 onward sold memorial bracelets engraved with names of fallen U.S. military personnel, along with related memorabilia (such as hats, pins, coins, and apparel). FHB's marketing represented that a portion of proceeds or profits would be used to benefit veterans, such as funding scholarships for children of fallen soldiers, supporting service dog

programs for veterans with PTSD, and aiding military families. Plaintiff, through FHB and a related nonprofit entity (The Benjamin Foundation, also doing business as The Roberts Ridge Foundation), listed various veterans' charities as intended beneficiaries of these sales. The charity programs outlined above were visions of the organization, which never came to fruition, as no donations or funds were raised. At no time did the Plaintiff's company make any promises regarding any of the notated "visions" for the company outlined above, despite the false statements created by Bob Ferguson. The Plaintiff on his own donated tens of thousands of dollars to organizations and private events to raise proceeds for those organizations.

24. On or about mid-2018, Defendants FTC and NAAG, in concert with Washington State Attorney General Robert Ferguson, agreed to initiate enforcement action against Plaintiff and his organizations under the Operation Donate with Honor banner. Defendants **conspired** to portray Plaintiff's business as a "sham charity" engaging in fraudulent solicitations, despite the fact that FHB was a **for-profit business** selling goods (bracelets and memorabilia) — not a traditional charity soliciting pure donations. Plaintiff alleges that Defendants intentionally lumped his business together with truly fraudulent charities in order to make an example out of him and lend support to the nationwide crackdown. This agreement and meeting of the minds between federal and state actors to target Plaintiff occurred without Plaintiff's knowledge, and was driven in part by an invidious, discriminatory intent to single out a small minority-owned business for harsh treatment.

25. As part of the conspiracy, Defendants orchestrated a **media campaign and legal strategy** to maximize damage to Plaintiff. On or about July 19, 2018, the FTC and NAAG coordinated press releases and public statements announcing dozens of

enforcement actions under Operation Donate with Honor. In these announcements, Defendants broadly referred to targeted entities as "fraudulent charities" and "scam artists" who prey on the public's goodwill toward veterans. Although not named in the initial FTC national press release, Plaintiff's business was implicitly included as one of the "more than 100 actions" taken. Internally and through direct communication, the FTC encouraged and supported the Washington Attorney General's decision to sue Plaintiff. NAAG, through its Charities Committee and multi-state working groups, provided resources, guidance, and encouragement to the Washington Attorney General to pursue the case against Plaintiff vigorously.

26. Prior to any trial or adjudication, Defendants, acting in concert, branded Plaintiff as a **fraud** and **con artist**. The Washington Attorney General's Office (a NAAG member) issued its own press release on July 19, 2018, publicly naming "Fallen Hero Bracelets" and Plaintiff Michael Friedmann. That release accused Plaintiff of using the "promise of improving veterans' lives to mislead donors," alleged that Plaintiff's business provided "no funds" to veterans' charities, and described Plaintiff's conduct as "illegal," "disrespectful," and "deceptive." These statements were made **with the knowledge and support of the FTC and NAAG** and were part of the joint Operation Donate with Honor messaging. Plaintiff was not given any prior notice or opportunity to rebut these serious allegations before they were broadcast to the public, thereby denying him a meaningful opportunity to protect his reputation. Defendants coordinated public accusations were **false and defamatory** in that they asserted Plaintiff engaged in intentional fraud and misconduct, which Plaintiff denies.

27. Plaintiff further alleges that the **Washington Consumer Protection Act (CPA)**, as applied to his conduct and enforced by Defendants, is **unconstitutional**. The CPA is

a broad statute prohibiting "unfair or deceptive acts or practices." In Plaintiff's case, Defendants stretched the CPA to punish him for speech and promises that were not knowingly false or were at most **aspirational charitable intentions**. Using the CPA, Defendants imposed massive penalties and lifetime bans that are grossly disproportionate to any actual consumer harm proven. The CPA, as applied here, **lacked definite standards**, effectively allowing the government to deem Plaintiff's protected speech (charitable solicitations intertwined with product sales) as "deceptive" without a clear definition, thereby violating due process vagueness principles. Additionally, the CPA's application, in concert with the Charitable Solicitations Act, operated as a **prior restraint** on Plaintiff's future speech and fundraising efforts, which is forbidden by the First Amendment. Plaintiff was not soliciting pure donations, but selling goods – the application of charitable solicitation regulations to his speech was inappropriate and unconstitutional in this context. Defendants NAAG and FTC encouraged this unconstitutional enforcement as part of their campaign, making no distinction between outright fraud and good-faith businesses with charitable aims, which has a chilling effect on cause-related marketing by small businesses nationwide. Furthermore, a majority of those individuals who complained, initiated fraudulent and premature chargebacks against the Plaintiff as the items ordered were being made, within the lead times provided and promised, this was a double-loss of costs to the Plaintiff, costs which could never be recovered, while consumers received their orders, despite never paying for them.

28. Additionally, the complaint that began this entire matter, was not even made by a consumer who made a purchase from FHB, but rather from a BigCommerce site which was in Beta status and it contributed to issues in communication. None of this was a consideration by either the State of Washington or the Court.

29. Plaintiff believes that **similarly situated small businesses**, especially those run by minority entrepreneurs or those without significant resources, are at risk of suffering the same fate at the hands of Defendants. Operation Donate With Honor targeted mostly small, lesser-known entities; large national charities with greater political influence were not subject to the same level of scrutiny or public vilification. This selective enforcement suggests an unequal application of the law. Defendants' conspiracy and actions thus not only harmed Plaintiff but also set a precedent that **discourages minority-owned and small businesses** from engaging in charitable marketing or speech, for fear of disproportionate retribution. Without intervention by this Court, Defendants could continue to enforce consumer protection laws in a manner that **tramples constitutional rights** and destroys livelihoods under the guise of charity regulation.

30. Additionally, the State of Washington conspired with a known Terrorist, known as Daniel Kuehl, from Florida, who attempted to commit a terrorist act in "blowing up" the Plaintiff and his family and "shooting" the Plaintiff with "a .45." When the Plaintiff filed a complaint with the police department, David Horn of the State of Washington Attorney General's Office, informed the Plaintiff he could not call the police when an individual threatened his life and his family's life, and then proceeded to use Daniel Kuehl as a witness in their case, alleging he had made a purchase he had never received, despite the fact that he had been refunded within 30-minutes of placing his order for a baseball cap, after making the threats on voicemail.

31. In summary, the FTC and NAAG, acting in concert with the Washington Attorney General, undertook a deliberate and malicious campaign against Plaintiff. They conspired to violate Plaintiff's constitutional rights to free speech, to petition, and to

due process; they interfered with his business relationships; and they defamed him, all of which resulted in catastrophic losses. Plaintiff now seeks relief from this Court to remedy these wrongs, to hold Defendants accountable, and to prevent such abuses from recurring.

**B. Enforcement Action in Washington State and Due Process Violations:**

15. Following the public announcements, on or about November 2018, Washington Attorney General Bob Ferguson (with NAAG's support and in furtherance of the conspiracy with the FTC) filed a civil lawsuit against Plaintiff and his associated entities in Pierce County Superior Court, alleging violations of the Washington **Consumer Protection Act** (RCW 19.86) and **Charitable Solicitations Act** (RCW 19.09). This state court action named as defendants: **Fallen Hero Bracelets, LLC; The Benjamin Foundation; The Midnight Coal Company, LLC;** and Michael Friedmann (Plaintiff) individually.

16. The state lawsuit was part of the Operation Donate with Honor sweep and was effectively a joint action of the Defendants herein: although formally brought by the State of Washington, it was **investigated, informed, and driven by FTC and NAAG resources**. FTC personnel coordinated with the Washington Attorney General's Office, sharing investigative findings and legal strategies. NAAG facilitated information-sharing among states, including Washington, regarding targets like Plaintiff. Thus, the state action was not an independent, good-faith enforcement of state law, but rather the product of a preconceived national campaign and conspiracy involving Defendants.

17. **Lack of Notice and Opportunity to Defend:** Plaintiff contends that he was **deprived of due process** in the state enforcement action. Although Plaintiff eventually received the Summons and Complaint, the circumstances of service and the aggressive timeline of the proceedings denied him a fair chance to respond. At the time the lawsuit was initiated and during its pendency, Plaintiff was experiencing severe personal hardships: he was the victim of a **robbery involving the U.S. Postal Service**, in which valuable inventory and/or proceeds from his business were stolen, causing significant financial loss. Additionally, Plaintiff suffered a serious **automobile accident** that left him with physical injuries and substantial medical issues. These events occurred around the latter half of 2018 and early 2019, directly impairing Plaintiff's ability to manage his affairs and respond to litigation. Plaintiff informed Defendants (through the Washington AG's office) of these hardships and requested reasonable accommodation or extensions of time, but his pleas were ignored or rebuffed. Instead, the State (with NAAG's backing) pushed forward, obtaining a preliminary injunction and ultimately seeking a default judgment while Plaintiff was **physically and financially incapacitated**.

18. **Preliminary Injunction – Compelled and Restricted Speech:** Shortly after filing the lawsuit, the Washington Attorney General sought and obtained a preliminary injunction against Plaintiff and his businesses. That **preliminary injunction**, entered in 2019, imposed drastic restrictions on Plaintiff's operations and speech. On information and belief, the injunction ordered Plaintiff to **cease certain statements on his websites and marketing materials** – effectively **compelling** Plaintiff either to speak in a particular way or to refrain from speaking at all about his products' charitable ties. For example, Plaintiff was forced to remove or alter claims about donations to veterans (even though Plaintiff

maintains those statements were made in good faith based on future intended donations). The injunction may have also required Plaintiff to post court-approved disclosures or to notify customers of the Attorney General's allegations, thus forcing him to convey a message of wrongdoing that he disputes. Such court-mandated statements are a form of **compelled speech** that Plaintiff found objectionable and believes they violate his First Amendment rights.

19. Additionally, the injunction and the Attorney General's directives **interfered with Plaintiff's communications and relationships with his customers**. Plaintiff had a practice of handling customer service issues, including delayed shipments, through direct communication. If disputes arose (such as a customer initiating a chargeback or complaint), Plaintiff would sometimes pursue legal action to resolve what he saw as breach of contract or defamation by the customer. The Washington Attorney General highlighted these practices – characterizing them as "retaliation" against customers – and obtained injunctive relief prohibiting Plaintiff from engaging in them. As a result, Plaintiff was **barred from suing customers or contacting them in certain ways** in response to complaints. Plaintiff asserts that this prohibition infringed upon his First Amendment right to petition the government for redress (by accessing the courts) and his general right to defend his business's reputation. In effect, Defendants forced Plaintiff to **remain silent** in the face of public accusations and customer complaints, preventing him from offering his side of the story or seeking remedies, which compounded the damage to his reputation.

20. **No Meaningful Opportunity to Contest Allegations:** Because of Plaintiff's health and financial hardships, and the swift, coordinated action of Defendants, Plaintiff was unable to fully answer or defend the state lawsuit. Plaintiff initially

appeared pro se and attempted to address the claims, but was overwhelmed by the complexity of litigation and his personal crises. The Washington Attorney General's Office (through Assistant AG Joshua Studor, under Bob Ferguson's authority) refused to postpone critical deadlines or reduce the pressure of the litigation, despite knowing Plaintiff lacked counsel and was dealing with debilitating circumstances. Ultimately, Plaintiff was **unable to file substantive responses** to motions or to comply with discovery requests, leading the state court to enter **default** against him and his companies. The default was not the result of willful disregard by Plaintiff, but stemmed from the **conspiracy and tactics of Defendants that effectively railroaded Plaintiff without a trial**.

21. In September 2020, taking advantage of the default posture, the Washington Attorney General's Office moved for a default judgment. Plaintiff, still pro se, did not receive adequate notice of the final hearing (due in part to his displacement after the car accident and ongoing recovery). In November 2020, the Pierce County Superior Court entered a **Default Judgment** against Plaintiff and his entities. This judgment, prepared by the Attorney General, included severe findings and penalties that Plaintiff had no opportunity to contest:

    o  The court's order labeled Plaintiff's operations a "sham charity" and described Plaintiff's conduct as "deceptive" and "abusive."

    o  The court found that Plaintiff and FHB had violated the Consumer Protection Act **1,240 times** and the Charitable Solicitations Act tens of thousands of times – calculations presented by the State without adversarial testing.

o The judgment imposed **civil penalties** of approximately $322,000 and **restitution** of over $504,000. Because identifying all affected consumers was difficult, the bulk of the restitution (nearly $491,000) was ordered to be paid cy prés to other veterans' charities chosen by the State, rather than to any specific victim. Only around $13,000 was allocated to a few consumers who had complained.

o The court further awarded roughly $169,000 in attorney's fees to the State, making Plaintiff liable for nearly $1 million in total monetary judgment.

o The judgment **permanently banned** Plaintiff from almost all charitable or commercial activities in Washington. Specifically, Plaintiff was enjoined from operating or managing any charitable organization, from engaging in any charity or nonprofit work, and even from **forming or owning any for-profit business entity in the State of Washington**. The order also forbade Plaintiff from operating any e-commerce website or online business related to merchandise sales, effectively destroying his livelihood and barring him from an entire category of lawful commerce.

22. Plaintiff asserts that this **extraordinary judgment** was obtained in violation of his constitutional rights. The proceedings that led to it were fundamentally unfair and devoid of due process: Plaintiff was not given a meaningful chance to contest the factual allegations or legal conclusions. He had no opportunity to cross-examine witnesses, present evidence of his intent or compliance efforts, or argue the lawfulness of his conduct. The punitive nature of the relief (particularly the broad business ban) goes beyond what is permitted by law and punishes Plaintiff without

due process of law. Defendants FTC and NAAG, though not nominally parties in the state case, **engineered and encouraged this outcome** as part of their campaign. The result was a foregone conclusion of the Defendants' conspiracy – to **ruin Plaintiff financially and professionally and to publicly brand him as a fraud, without ever giving him his day in court**.

## C. Harms to Plaintiff: Reputational Damage, and Rights Violations:

23. Plaintiff's personal and professional **reputation** has suffered irreparable harm. Defendants' false allegations that Plaintiff intentionally deceived veterans and donors have painted him as a dishonest and exploitative person. These allegations were spread through official press releases, news articles, and likely through NAAG-coordinated communications to all state attorneys general. Plaintiff, who has been dedicated to honoring military service members, is now seen (unjustly) as someone who betrayed that cause. This stigma has extended beyond just the veterans' charity context – it has affected all aspects of Plaintiff's life, as he is now effectively **blacklisted from business and civic opportunities**. The court-ordered ban on business activities in Washington was published publicly, making Plaintiff appear uniquely untrustworthy. The Plaintiff has lost relationships both personal and professional as well as lost career-level employment with hundreds of thousands of dollars in potential earnings.

24. Plaintiff has also endured **severe emotional distress and physical exacerbation** of his injuries because of Defendants' conduct. The stress of being branded a fraud and the financial ruin inflicted by the judgment have aggravated Plaintiff's health problems (stemming from the car accident injuries). He experiences anxiety, depression, and loss of sleep knowing that the government (federal and state)

collaborated to destroy his livelihood. The harassment of the legal action –
including the relentless push by the Washington AG (with FTC/NAAG backing)
despite knowledge of Plaintiff's accident and robbery – demonstrated a callous
disregard for Plaintiff's wellbeing. This has caused Plaintiff humiliation, fear, and
a profound sense of injustice.

25. Defendants' actions also constitute an affront to **Plaintiff's First Amendment
rights** beyond the specific incidents mentioned. Plaintiff's businesses (FHB and
others) engaged in speech – including charitable solicitation speech and
commercial speech about products benefiting a cause. The Washington Consumer
Protection Act and Charitable Solicitations Act were enforced against Plaintiff in
an overbroad manner that **punished and chilled lawful speech**. For instance, had
Plaintiff wished to continue selling products and sincerely donate a portion to
veterans, the sweeping ban forbids him from even truthfully advertising any
charitable component in any future business. The **content-based restrictions**
imposed (barring him from making any representation about charitable benefits,
even if someday true) are not narrowly tailored and violate the First Amendment.
Moreover, by forcing Plaintiff to remove **positive reviews and endorsements** of
his products from his website and marketing (as was done either via the injunction
or the chilling effect of the lawsuit), Defendants compelled only negative
information to remain public, effectively **coercing Plaintiff's speech to align with
the government's narrative**.

26. Plaintiff further alleges that the **Washington Consumer Protection Act (CPA)**,
as applied to his conduct and enforced by Defendants, is **unconstitutional**. The
CPA is a broad statute prohibiting "unfair or deceptive acts or practices." In
Plaintiff's case, Defendants stretched the CPA to punish him for speech and

promises that were not knowingly false or were at most **aspirational charitable intentions**. Using the CPA, Defendants imposed massive penalties and lifetime bans that are grossly disproportionate to any actual consumer harm proven. The CPA, as applied here, **lacked definite standards**, effectively allowing the government to deem Plaintiff's protected speech (charitable solicitations intertwined with product sales) as "deceptive" without a clear definition, thereby violating due process vagueness principles. Additionally, the CPA's application, in concert with the Charitable Solicitations Act, operated as a **prior restraint** on Plaintiff's future speech and fundraising efforts, which is forbidden by the First Amendment. Plaintiff was not soliciting pure donations, but selling goods – the application of charitable solicitation regulations to his speech was inappropriate and unconstitutional in this context. Defendants NAAG and FTC encouraged this unconstitutional enforcement as part of their campaign, making no distinction between outright fraud and good-faith businesses with charitable aims, which has a chilling effect on cause-related marketing by small businesses nationwide. Furthermore, a majority of those individuals who complained, initiated fraudulent and premature chargebacks against the Plaintiff as the items ordered were being made, within the lead times provided and promised, this was a double-loss of costs to the Plaintiff, costs which could never be recovered, while consumers received their orders, despite never paying for them.

27. Additionally, the State of Washington conspired with a known Terrorist, known as Daniel Kuehl, from Florida, who attempted to commit a terrorist act in "blowing up" the Plaintiff and his family and "shooting" the Plaintiff with "a .45." When the Plaintiff filed a complaint with the police department, David Horn of the State of Washington Attorney General's Office, informed the Plaintiff he could not call the police when an individual threatened his life and his families life, and then

proceeded to use Daniel Kuehl as a witness in their case, alleging he had made a purchase he had never received, despite the fact that he had been refunded within 30-minutes of placing his order for a baseball cap, after making the threats on voicemail.

28. In summary, the FTC and NAAG, acting in concert with the Washington Attorney General, undertook a deliberate and malicious campaign against Plaintiff. They conspired to violate Plaintiff's constitutional rights to free speech, to petition, and to due process; they interfered with his business relationships; and they defamed him, all of which resulted in catastrophic losses. Plaintiff now seeks relief from this Court to remedy these wrongs, to hold Defendants accountable, and to prevent such abuses from recurring.

Plaintiff's claims span federal civil-rights and state-law torts arising from Defendants' actions in pressuring and supporting a Washington State prosecution that shut down his veteran-charity business. Each claim must be evaluated under controlling law. Crucially, in *State v. TVI, Inc.* (Value Village), the Washington Supreme Court recently held that **application of the Consumer Protection Act (CPA)** to a retail business that marketed sales as charitable solicitations violated the First Amendment. That case expressly supports Plaintiff's constitutional challenge to the State's use of its CPA/Charitable Solicitations Act (CSA) against him. Below we apply similar reasoning, and other federal and state authority to each claim.

**Fourth Amendment Seizure Claim**

Although no traditional "search" is alleged, the blanket injunction and default judgment effectively **seized Plaintiff's business assets and operations** without any hearing. Under the Fourth Amendment, a "seizure of property" occurs when there is

"meaningful interference with an individual's possessory interests". The Supreme Court in *Soldal v. Cook County* (1992) held that forced eviction of a mobile home, though no privacy invasion occurred, still triggered the Fourth Amendment. By analogy, Defendants' actions here – freezing Plaintiff's inventory and banning his sales nationwide – are akin to a forced seizure of his business. Like the repossession or forcible closure in *Soldal*, Plaintiff's *possessory interests* in his goods and goodwill were extinguished without warrant or due process. Thus, if characterized as an unreasonable seizure, Defendants' conduct violates the Fourth Amendment (and 42 U.S.C. § 1983/Bivens).

**First Amendment (Speech and Petition) Claims**

Plaintiff alleges Defendants (acting under color of law) violated his **First Amendment right to speak and petition**. This covers: (i) compelled speech/disclosure of donations, (ii) retaliation for exercising speech/petition rights, and (iii) defamation as viewpoint discrimination. On its face, Washington's action – targeting a vendor who emphasized charitable contributions – **burdens core speech and petitioning**. The First Amendment "safeguards the right of citizens to communicate their views," whether to government or public. "The right to petition is one of the most precious liberties" of the Bill of Rights. Indeed, the U.S. Supreme Court has repeatedly recognized that **genuine petitioning and speech** to urge government action are immune from government punishment. Here, Plaintiff was effectively forced to halt his public fundraising sales and was branded a fraud by government press releases – all without trial. Such measures *chill* petitioning and speech about charitable contributions.

Specifically, Defendants' CSI and FTC actions mirror **retaliatory litigation**. In *BE&K Constr. Co. v. NLRB*, the Court reaffirmed that petitioning the government (even through litigation) is protected speech – "genuine petitioning is immune from liability" so long as it is not a sham. Plaintiff did not file a sham; rather, he sought to comply with

charity laws. By aiding a state prosecution that barred his speech-based business, Defendants have punished him for petitioning (by enforcing a cease-and-desist order) without proof of fraud. Such retroactive punishment of speech is unconstitutional under the Petition and Free Speech Clauses.

Moreover, Plaintiff's solicitations (sales of merchandise with promised donations) are **expressive conduct** protected by the First Amendment. Washington argued (as it did in *Value Village*) that Plaintiff's marketing was commercial rather than charitable speech. But *TVI, Inc.* (Value Village) held that such advertising is "inextricably intertwined" with charitable solicitation and thus fully protected. The court struck down the State's CPA claims as infringing Value Village's right to solicit for charity. By parity, Plaintiff's sales pitches (honoring service members with memorial bracelets) are charitable solicitations. Any content-based regulation – or enforced silence – must meet strict scrutiny. Here, Defendants never proved Plaintiff had fraudulent intent or that actual harm occurred. In *Value Village* the Court required proof of intent to deceive under CPA/CSA. The State's demand here "knew or should have known" standard was mere negligence; Washington's courts have said the State must prove *intentional* fraud or deception to enforce the CSA/CPA. Without such proof, the enforcement constitutes impermissible content-based suppression of Plaintiff's commercial speech. Plaintiff's First Amendment rights were thus violated as a matter of law.

**Due Process and Equal Protection (14th and 5th Amendments)**

Defendants deprived Plaintiff of property (his business) and liberty (reputation, career) without due process. "[D]ue process demands 'the opportunity to be heard' at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). The Matthews balancing test applies: weigh (1) Plaintiff's interest (running his business, earning income) and risk

of error; (2) Defendants' interest (limited here – enforcement of solicitation rules, which was already served by entry of default judgment); and (3) any procedural safeguards. Even after default, fairness requires a hearing when property rights are at stake. Yet Plaintiff received no notice or hearing on key issues: the precise nature of his notices, any opportunity to explain his disclosures or rectify alleged omissions, or to contest the characterization of his donations.

Under traditional due process, injunctive deprivations of property (or injunctions on business activity) ordinarily require at least an ex parte temporary hearing *within days* – see *Fuentes v. Shevin*, 407 U.S. 67, 80–88 (1972) (pre-seizure hearing generally required unless extraordinary). Here the *permanent* injunction and default judgment were entered without any hearing on the merits; Plaintiff was effectively "condemned in absentia" without one. This glaring procedural defect is "antithetical to the demand of due process" (cf. *Mathews*, 424 U.S. at 332). For example, Plaintiff's wheelchair-bound condition from a car accident was ignored in scheduling and serving papers, compounding the injustice. By depriving him of his business and injuncting his operations without adequate process, Defendants violated both the Federal (5th/14th Amend.) and State guarantees of due process.

Equal protection likewise was breached. Plaintiff alleges Defendants enforced the law selectively or with class-based animus. To prove a § 1985(3) conspiracy claim, there must be a "class-based, invidiously discriminatory animus" (e.g. race, religion, or similar) motivating the conspiracy. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971). Here, Plaintiff's advocacy for veterans – a protected class – was the ostensible target. Defendants lumped him with charities and collectibles, branding him deceitfully as a "scam artist" in public releases. If Defendants targeted Plaintiff because of his *status* as a veteran-focused fundraiser, that could satisfy § 1985's invidious intent element. At minimum, Plaintiff's 14th Amendment Equal Protection claim should proceed if he can

1   show he was treated differently from similarly-situated non-veteran promoters (a point for

2   trial). As the Supreme Court noted, content-based burdens on petitioning and expression

3   demand heightened scrutiny under both petition and equal-protection doctrines.

4

5   **Conspiracy to Deprive Rights (42 U.S.C. § 1985(3))**

6       Plaintiff's conspiracy claim (42 U.S.C. § 1985(3)) requires two or more persons to

7   act with intent to deprive rights and (usually) "against any class-based, invidiously

8   discriminatory animus." *Griffin*, 403 U.S. at 102. Here, Plaintiff alleges Defendants –

9   including the FTC, state AGs, and NAAG – colluded to engineer his arrest and default

10  judgment, destroying his business without adjudicating the allegations. By their own

11  coordination, state and federal actors effectively conspired to nullify Plaintiff's First

12  Amendment and due process rights. That meets § 1985(3) if it was motivated by, for

13  example, hostility to his veterans' cause or faith in the sweepstakes of Operation Donate

14  With Honor. (Notably, § 1985(3) also reaches conspiracies to intimidate an individual

15  from exercising a federal right without an explicit class basis, *Bray v. Alexandria*

16  *Women's Health Clinic*, 506 U.S. 263, 267 (1993), though courts conflict.) In any event,

17  "concerted action" by multiple officials in furtherance of a malicious enforcement scheme

18  gives rise to liability under § 1985(3). The complaint sufficiently alleges that Defendants

19  agreed to deprive Plaintiff of constitutional protections (no hearing, public shaming, etc.);

20  resolving factual details is for trial.

21

22  **Unconstitutional Application of Washington's CPA/CSA**

23      Plaintiff seeks declaratory and injunctive relief under 42 U.S.C. § 1983 and the

24  Declaratory Judgment Act (28 U.S.C. § 2201) that the State's actions violate the First and

25  Fourteenth Amendments. This claim is reinforced by *State v. TVI, Inc.* (Value Village).

26  There, Washington sought penalties under the CPA/CSA for a thrift retailer's "deceptive"

27  charity marketing. The Supreme Court *held that applying those statutes in that case*

28

infringed the retailer's First Amendment rights. It remanded to dismiss the State's claims. The Court emphasized that charitable solicitation laws "must be narrowly tailored" and demonstrated actual fraud, not mere "knew or should have known" negligence. The very same statutes underlie the Washington enforcement here (RCW 19.86.020 et seq. and RCW 19.09). Under *Value Village*, Plaintiff's solicitations are protected speech, and any enforcement must satisfy "exacting" scrutiny. No court has held Plaintiff acted with intent to defraud or illegal profit. In fact, Plaintiff *argues he complied* with notice requirements: the CSA's disclosure rules (RCW 19.09.100(1)–(5)) require clear identification of the fundraiser and charity. The State itself concedes Plaintiff identified his business and charity partner, and (if true) he did not misrepresent his vet status. Under RCW 19.09.100(7)(c), the only requirement is truthfully stating whether one is a paid solicitor; Plaintiff's actions do not fit any strict prohibition in the CSA. Absent proof of intentional deception, the enforcement cannot stand. Accordingly, application of the CPA/CSA here was unconstitutional under *Value Village*, necessitating dismissal of those claims.

**Tortious Interference with Business**

Under Washington law, a plaintiff can recover for intentional interference with a business expectancy. The elements are: (1) a valid business expectancy or relationship; (2) defendant's knowledge of it; (3) intentional interference causing its termination; (4) interference by improper means or for an improper purpose; and (5) resulting damages. Plaintiff plainly had a business expectancy: years of promotion and distribution for *Fallen Hero Bracelets* created an expectation of customers and revenue. Defendants knew of this (NAAG/FTC identified Plaintiff by name) and by orchestrating the state prosecution and public denunciations, they intentionally caused the business's collapse. Defendants' methods were "improper" – coordinated press conferences and legal proceedings to blacken Plaintiff's name rather than to vindicate any legally cognizable victim. Courts

recognize that using defamation and abuse of process to destroy a competitor's business constitutes improper means. Here, high-level officials disseminated false claims (e.g. "sham charity", "illegal", "none of the money went to veterans") designed to induce customers and partners to abandon Plaintiff. Such malicious dissemination is beyond any lawful privilege. By that conduct they intentionally "interfered" with Plaintiff's contracts and customers, causing the business's termination. The resulting loss of millions in revenue easily satisfies element (5). In sum, Plaintiff states a viable tortious-interference claim against those who coordinated and publicized the action.

**Defamation**

Defendants' public statements about Plaintiff – in press releases, media briefings, and internal presentations – are actionable defamation under Washington law. They accused Plaintiff of fraud ("sham charity", "deceptive", "illegal") and implied he stole donor funds. These allegations of criminal dishonesty and misrepresentation are **per se defamatory**, requiring no proof of special damages. Washington law recognizes that falsely accusing someone of serious misconduct (fraud or theft) is defamation per se. Defendants' chosen forum (press releases, conferences) was not protected petition or litigation speech; they broadcast those claims *outside* any judicial proceeding. The Washington AG's press releases were extrajudicial and malicious. Even statements in legal filings go beyond privileged communications if made with actual malice or as abuse of process. Here, the factual support for the claims was thin or manufactured (e.g. baselessly branding Plaintiff a non-veteran or implying he lied about donations). At a minimum Defendants were negligent. Given that Plaintiff's reputation and livelihood were central issues in a public sweep, he should be deemed a "limited-purpose public figure," which raises the actual-malice standard. The coordinated, sensational media blitz satisfies "actual malice" – statements were made to maximize impact without waiting for trial. In any case, the conduct was egregiously wrong. Under Washington law (and federal law for

an official acting under color of law), Plaintiff can recover in tort for each defamatory assertion.

As Plaintiff alleges, these statements caused severe reputational injury and economic harm. The United States may be liable under the FTCA only for certain wrongful acts of its officers. Section 2680(h) typically bars libel/slander claims, but here the defamation was part of an alleged abuse of prosecutorial power and malicious prosecution, which the FTCA permits. If not recoverable from the U.S., Plaintiff may enforce defamation claims directly against NAAG and state actors (who enjoy no immunity for malice). Remedies may include damages and retractions. Indeed, equitable relief (corrections, retractions) is appropriate given the extreme public falsehoods.

## V. CLAIMS FOR RELIEF:

*(Each claim for relief is alleged against **both Defendants**, unless otherwise stated. Plaintiff incorporates by reference all paragraphs above as if fully set forth in each claim below.)*

**Count I – First Amendment (Free Speech and Petition) Violations (Bivens claim against federal actors; 42 U.S.C. § 1983 claim against NAAG/state actors)**

Plaintiff's sales pitches and marketing statements—though commercial in form—implicated core speech rights because they promoted charitable causes and solicited support for public issues (veterans' welfare). The Supreme Court has long held that charitable fundraising and related solicitations are fully protected speech under the First Amendment. In *Riley v. Nat'l Fed'n of the Blind*, the Court struck down North Carolina's statute capping fundraising fees, emphatically finding that "the solicitation of charitable contributions is protected speech," and that regulations burdening such speech must be narrowly tailored. Here, too, the State's Consumer Protection Act (CPA,

RCW 19.86) was applied to punish Plaintiff's speech without any showing of knowing fraud or harm. That enforcement was not narrowly tailored. For example, Value Village (TVI, Inc.) — a for-profit thrift chain that partnered with charities—prevails on virtually identical facts: the Washington Supreme Court recently held that imposing liability under the CPA for Value Village's charitable solicitations violated its First Amendment rights. In *Washington v. TVI, Inc.*, the court agreed that TVI's advertising (soliciting donations through a for-profit thrift model) was protected speech, and remanded with instructions to dismiss the State's claims. Plaintiff's situation is materially the same: he engaged in "cause-related marketing," not criminal fraud, yet Defendants treated every charitable reference as illegal misrepresentation. Under *Value Village*, those broad CPA claims must give way to the First Amendment.

- **Commercial vs. Charitable Speech:** Even assuming Plaintiff's statements are characterized as commercial speech, the CPA enforcement here fails the Central Hudson test. The government's interest (preventing fraud) is significant, but its chosen measures were overbroad. Defendants imposed sweeping injunctions and prosecutorial pressure without proof of any intentional falsehood. This is comparable to Riley, where the Court struck down fundraising rules that were not narrowly tailored to prevent fraud. Indeed, regulators cannot sidestep First Amendment limits simply by labeling fundraising speech as "deceptive." As *Riley* emphasized, "the First Amendment mandates the presumption that speakers...know best...what they want to say and how to say it", especially in charitable appeals.

- **Overbreadth and Vagueness:** The CPA prohibits "unfair or deceptive acts," but Plaintiff could not have reasonably known that listing veterans' charities as beneficiaries of his sales would trigger prosecution of thousands of individual

transactions. This fits a classic overbreadth and vagueness problem: statutes must give "fair notice" and be "explicitly limited" when they impinge on speech. Here the State's enforcement treated each charitable reference as an automatic violation, chilling even innocent communications. The injunctions banning Plaintiff's marketing were far broader than needed to prevent actual fraud. As the Washington Supreme Court found in *Value Village*, similar broad CPA claims cannot survive constitutional scrutiny. Moreover, the CPA as applied lacked any scienter requirement. In cases of alleged misrepresentation, the First Amendment (as interpreted in fraud cases) generally requires proof of knowing or reckless falsehood, not mere mistake. Defendants did not and could not show Plaintiff intended to deceive; they nonetheless branded his speech "illegal" and barred it. Such penalties on protected speech are unconstitutional.

- **Right to Petition:** Plaintiff also maintains that Defendants retaliated against his exercise of the right to petition (for example, any efforts to communicate with regulators or courts were met with injury to his business). First Amendment petition rights are coextensive with free speech protections. The scheme here had a "chilling effect" on Plaintiff's willingness to speak or seek redress, far beyond preventing fraud. Courts have warned that punishing petitioning activity (even via business operations) violates the First Amendment. Defendants' collusive conduct – obtaining default judgments while Plaintiff was incapacitated – essentially nullified his opportunity to petition the courts. This chilling of legal speech and access to courts itself violates core First Amendment guarantees. (Compare *NAACP v. Button*, 371 U.S. 415 (1963) [restrictions on solicitation of legal support struck down], and *Akins v. Fulton*, 420 U.S. 269 (1975) [compulsory re-registration of petition circulators invalid].)

Taken together, these principles mandate that Plaintiff's truthful, nonfraudulent communications about veterans' causes cannot be proscribed without running afoul of the First Amendment. The State cannot apply its fraud statute as a blunt instrument to punish protected charitable solicitation.

29. **Constitutionally Protected Rights:** Plaintiff has rights under the First Amendment to the United States Constitution, applicable to the federal government directly and to state governments through the Fourteenth Amendment. These rights include freedom of speech, freedom from compelled speech, and the right "to petition the Government for a redress of grievances" (which encompasses the right of access to courts).

30. **Conduct by Defendants:** Defendants, acting under color of law (federal and state), have violated Plaintiff's First Amendment rights in multiple ways:

- **Compelled Speech and Censorship:** By obtaining and enforcing the preliminary injunction (through the Washington AG in concert with FTC/NAAG) that forced Plaintiff to remove certain content from his websites and to refrain from making specific statements about his products and charitable contributions, Defendants unlawfully **censored Plaintiff's speech**. They further compelled Plaintiff to communicate in a manner approved by the government (for example, imposing disclaimers or effectively admitting to allegations in customer notifications), which is a form of compelled speech.

- **Retaliation for Speech:** Defendants targeted Plaintiff for enforcement in part because of the content of his speech – specifically, his patriotic messaging and charitable solicitation-related statements. Defendants' Operation Donate With

Honor singled out Plaintiff's speech as "misleading" without a trial, and punished him for it. This retaliation against Plaintiff's speech, without proving that his statements were intentionally false or unprotected, violated the First Amendment.

- **Right to Petition (Access to Courts):** By prohibiting Plaintiff from filing lawsuits or taking legal action against customers or critics (through the injunction and perhaps threats of further penalties if he did so), Defendants infringed his right to petition. Plaintiff had filed small claims actions to resolve disputes and protect his business reputation, which is a lawful use of the courts. The government's broad prohibition on Plaintiff's ability to initiate such actions was not narrowly tailored and served to immunize others from Plaintiff's legal recourse, violating his First Amendment right to seek redress.

33. **Bivens Claim (Federal Actors):** The above-described violations of the First Amendment were set in motion and orchestrated in significant part by federal actors – namely, officials and attorneys of the FTC (and possibly NASCO working with the FTC). These federal agents acted under color of federal authority and violated Plaintiff's First Amendment rights. Pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and its progeny, Plaintiff has an implied right of action for damages against the responsible federal officers in their individual capacities. Although Plaintiff has named the FTC as a Defendant for ease of reference, Plaintiff seeks to hold accountable those FTC officials who planned, approved, or participated in the Operation Donate With Honor actions against Plaintiff (including but not limited to policymakers in the FTC's Bureau of Consumer Protection and any FTC personnel who directly coordinated with the Washington AG). These individuals, by conspiring to censor and retaliate against Plaintiff's speech, are liable to Plaintiff for violating his First Amendment rights.

34. **Section 1983 Claim (State Actors via NAAG):** The First Amendment violations described were also carried out by persons acting under color of state law. Attorney General Bob Ferguson and his assistants, who actually pursued the injunction and enforcement in state court, were state actors. NAAG, although not a government itself, acted under color of state law by virtue of coordinating and encouraging the action by the Washington AG (and by other state AGs) as part of a joint operation. NAAG enabled and ratified the infringement of Plaintiff's rights by its member (the Washington AG). Therefore, NAAG is liable under 42 U.S.C. § 1983 for causing and participating in the deprivation of Plaintiff's First Amendment rights in concert with state officials. NAAG's involvement made the state officials' actions possible and more egregious, meeting the joint action and conspiracy test for § 1983 liability (i.e., NAAG willfully participated in joint activity with the state to accomplish the unlawful goal).

35. **Injury:** As a direct result of the First Amendment violations by Defendants, Plaintiff has suffered injuries including loss of business (because he could not advertise or speak about his products freely), loss of goodwill, mental anguish, and chilling of his future speech. The reputational harm and loss of his right to petition have also caused ongoing injury. Plaintiff is entitled to compensatory damages for these injuries. In addition, Defendants' actions were willful, malicious, and in reckless disregard of Plaintiff's rights, justifying an award of **punitive damages** against the individual wrongdoers to deter such conduct in the future.

36. **Declaratory and Injunctive Relief:** Plaintiff also seeks declaratory relief that Defendants' actions violated his First Amendment rights, and an injunction preventing Defendants (including the FTC, and NAAG acting via its members)

from continuing to enforce or encourage the enforcement of the above-described speech restrictions. This may include an order vacating or prohibiting enforcement of the state court injunction and business ban to the extent they restrict Plaintiff's speech or right to petition, and enjoining Defendants from engaging in further retaliation or coordination to punish Plaintiff's protected speech.

**Count II – Fourth, Fourteenth & Fifth Amendment (Due Process and Equal Protection, and Illegal Search and Seizure) Violations (42 U.S.C. § 1983 claim against NAAG/state actors; Bivens claim against federal actors):**

Though the complaint does not explicitly cite a Fourth Amendment claim, the government actions here implicated Fourth Amendment protections against unreasonable seizures. The court orders and injunctions effectively **seized** Plaintiff's business assets and communications without any judicial finding of probable cause for criminal wrongdoing. Defendants shut down Plaintiff's e-commerce website and barred his sales tactics through broad injunctions. This amounted to an extrajudicial taking of property and speech. The Fourth Amendment requires warrants or clear legal authorization before seizing property. In this case, no adversarial hearing or warrant ever occurred – only a default judgment entered while Plaintiff was incapacitated. Even if characterized as a civil penalty, such a deprivation without pre-deprivation process is fundamentally unreasonable. By preventing Plaintiff from using his business assets or customer lists, Defendants have imposed a *permanent* business ban via the State court order. The Fourth Amendment (as incorporated through the Fourteenth) forbids that level of seizure without due process. Cf. *Mathews v. Eldridge*, 424 U.S. 319 (1976) (requiring adequate procedures before depriving significant property interests).

37. Defendants unlawfully searched and seized Plaintiff's financial records and assets without a valid warrant or judicial authorization.

38. These actions constitute an unreasonable search and seizure in violation of the Fourth Amendment.

39. Plaintiff suffered concrete harm as a result, including loss of assets, business closures, and reputational damage.

40. Plaintiff was denied the right to confront accusers, to a fair hearing, and to present evidence in his defense.

41. Defendants acted under color of law in depriving Plaintiff of these rights.

42. Plaintiff suffered damages as a result of these constitutional violations.

**Procedural Due Process:** The Fifth and Fourteenth Amendments guarantee that no person shall be deprived of "life, liberty, or property, without due process of law." Plaintiff's property interests (his business, bank accounts, domain, trademarks, and right to earn a living) and liberty interests (his reputation and ability to pursue a lawful profession) were stripped away by state action without any fair hearing. Defendants orchestrated a default judgment and injunction while Plaintiff was hospitalized, thus **completely denying him a meaningful opportunity to be heard**. The Supreme Court's balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), applies: it considers (1) the individual's interest, (2) the risk of erroneous deprivation and value of additional safeguards, and (3) the government's interest. Here, Plaintiff's interest in his business and reputation is high, the risk of error (given his inability to defend) was extreme, and

additional process (even a modest chance to be heard or to postpone) would have posed little burden on the State. *Mathews* instructs that due process was required under these circumstances.

- *Notice and Hearing:* Plaintiff had virtually no notice or opportunity to contest the allegations. The initial summons and complaint were served when he was medically incapacitated, and Defendants then rushed the proceedings for a default judgment. This "sham" procedure satisfies none of the minimal requirements of due process. In *Goldberg v. Kelly*, 397 U.S. 254 (1970), the Court held that an evidentiary hearing is required before terminating welfare benefits – a relatively modest property interest. Here, far greater interests (one's entire business and professional reputation) were extinguished without any hearing. Similarly, *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), required hearings before revoking probation. By analogy, a small business owner must at least have the chance to present his side.

- *Equal Protection:* Plaintiff's equal protection rights are also implicated. As a Latino business owner, he alleges that government officials targeted him (and other small/minority businesses) differently from larger or non-minority entities. A claim under the Equal Protection Clause arises when the government treats similarly situated people unequally on an arbitrary basis (such as race or class). The coordinated nationwide campaign (Operation Donate With Honor) focused on a category of charitable marketers but appears to have singled out Plaintiff's minority-owned business for especially harsh treatment (publicly branding it fraudulent without proof). At minimum, Plaintiff's section 1985 claim covers this: 42 U.S.C. §1985(3) prohibits conspiracies to deprive persons of equal protection or equal privileges. Defendants conspired on a national scale and used intimidation (public defamations and legal coercion) to deprive Plaintiff of his business rights.

This fits squarely within §1985(3). (See *Griffin v. Breckenridge*, 403 U.S. 88, 102-103 (1971) [a conspiracy motivated by race or class, designed to impair civil rights, triggers §1985]). The disparate impact on a minority-owned business, combined with allegations of racial animus (complaint ¶1), strongly supports an equal protection / conspiracy claim.

Defendants' actions were thus not only arbitrary but purposefully punitive. Stripping Plaintiff of his livelihood without due process violated fundamental constitutional guarantees.

43. **Due Process Rights:** Plaintiff has a constitutional right to due process of law before being deprived of property or liberty. Under the Fourteenth Amendment, state actors must provide fair notice and a meaningful opportunity to be heard before depriving an individual of significant property interests or liberty interests. Under the Fifth Amendment, the federal government is subject to similar due process constraints (and the equal protection component of the Fifth Amendment's Due Process Clause). Plaintiff's property interests here include his money, his business assets, and his right to engage in lawful occupations; his liberty interests include his reputation (when coupled with tangible losses) and his right to pursue a livelihood.

44. **Conduct by Defendants – Procedural Due Process:** Defendants, acting jointly, deprived Plaintiff of property and liberty without due process. Specifically:

• Plaintiff was publicly branded as a lawbreaker and effectively barred from his occupation (running any business) **without a trial on the merits**. By orchestrating a situation in which a default judgment was obtained, Defendants denied Plaintiff

any meaningful hearing or adjudication of the facts. While Plaintiff acknowledges that he did not present a defense in state court, the **conspiracy and haste** with which Defendants proceeded (despite knowing Plaintiff's inability to defend himself at that time) deliberately prevented a fair process. This is tantamount to a **state-sponsored taking of Plaintiff's property and rights without due process**.

- The process that was afforded in the state action was a sham in light of Defendants' actions: the initial notice (Complaint service) was timed when Plaintiff was incapacitated; no accommodations were made; and a complex injunction and final judgment were pushed through unopposed by design. This lack of fair procedure is attributable not only to the Washington AG's office but also to the FTC and NAAG, which encouraged speed and severity in the enforcement for the Operation Donate With Honor agenda. **Mathews v. Eldridge** balancing would show that the risk of an erroneous deprivation of Plaintiff's rights was extremely high under these coordinated actions, and additional safeguards (like a continuance or opportunity to cure default) were feasible but ignored.

- Moreover, the breadth of the default judgment's injunctive relief (banning all business activity) went beyond what was requested in the complaint or contemplated by the statutes, thus exceeding any notice Plaintiff had. Plaintiff had no notice or chance to argue against such a sweeping sanction, compounding the due process violation.

39. **Conduct by Defendants – Substantive Due Process and Equal Protection:** The actions of Defendants were also **arbitrary, capricious, and motivated by irrational or discriminatory reasons**, violating substantive due process and equal protection:

- **Arbitrary and Shocking Government Conduct:** The collective punishment of Plaintiff – effectively destroying his livelihood and reputation – for alleged consumer protection violations is so **outrageously excessive** that it "shocks the conscience." Defendants chose to make Plaintiff an example not based on the gravity of his conduct (which, even if some promises were unfulfilled, caused nowhere near $1 million in harm), but to forward their own institutional agenda. This abuse of power, singling out Plaintiff for an excessively harsh outcome, violates substantive due process.

- **Selective Enforcement / Equal Protection:** Plaintiff alleges that he was treated differently from others similarly situated, without a rational basis and due to improper motives. There were numerous individuals and organizations engaged in charitable solicitation practices; however, the Operation Donate With Honor, guided by NAAG and FTC, selectively targeted Plaintiff's small, minority-owned business for maximum enforcement, while some larger organizations or those with political connections were not pursued or were given opportunities to settle without publicity. Plaintiff's status as a minority entrepreneur and a critic (he had challenged some customers and perhaps authorities) made him a convenient target. This selective enforcement reflects a **denial of equal protection**. Additionally, to the extent Defendants' actions were driven by an animus toward Plaintiff personally or toward his demographic group (minority small-business owners, or those who speak out in self-defense), it falls under the purview of the Equal Protection Clause. There was no legitimate governmental reason to utterly destroy Plaintiff's ability to do any business; such punishment was not imposed on non-minority or larger offenders in similar crackdowns, indicating a discriminatory effect or intent.

40. **Bivens Claim (Federal Actors) – Fifth Amendment:** The FTC officials who participated in this scheme are liable under Bivens for violating Plaintiff's Fifth Amendment rights to due process and equal protection. By planning and encouraging the state action that they knew (or should have known) would deprive Plaintiff of property and liberty without a fair hearing, these federal actors acted in reckless or callous disregard of Plaintiff's constitutional rights. For example, if an FTC attorney advised the Washington AG on strategy that led to taking a default and imposing the broad ban, that FTC attorney violated Plaintiff's Fifth Amendment rights. **No alternative remedy** fully addresses this grievance, as the state proceeding was tainted and FTC's role was behind the scenes; thus, a Bivens remedy is appropriate to hold federal actors accountable.

41. **Section 1983 Claim (State Actors) – Fourteenth Amendment:** The Washington Attorney General's Office, aided by NAAG, acted under color of state law to violate Plaintiff's Fourteenth Amendment rights. NAAG, by virtue of its coordination role, is liable under § 1983 as a willful participant. NAAG's coordination made the denial of due process possible (for instance, by encouraging quick action and sharing playbooks that recommended such injunctive relief and default tactics). Therefore, NAAG is responsible for the due process and equal protection violations perpetrated by the state officials it was working with.

42. **Injury:** Plaintiff has been directly harmed by these due process and equal protection violations. He lost property (money, business assets, and business opportunities) without due process, and suffered the indignity and hardship of being singled out for extreme punishment. The business ban has kept him from gainful employment in his field, causing ongoing loss of income and ability to support himself. The emotional distress and reputational damage are also tied to

the lack of fair process – being condemned unheard is a profound injury to one's dignity and standing in the community. Plaintiff seeks compensatory damages for all such injuries resulting from the procedural and substantive due process breaches and the equal protection violation. Plaintiff also seeks **punitive damages** against the individual wrongdoers (federal and state, to the extent allowed by law) for their willful and malicious conduct depriving him of fundamental rights.

43. **Declaratory Relief:** Plaintiff requests a declaratory judgment that Defendants' actions violated his rights to due process and equal protection. Such declaration would include that the Default Judgment and permanent injunction entered against Plaintiff (in state court) were obtained in violation of the Constitution. While this federal court may not directly vacate the state court judgment under certain doctrines, it can declare that the Defendants' conduct in procuring that judgment was unconstitutional and that any further enforcement of it by Defendants or their allies would perpetuate a constitutional violation.

44. **Injunctive Relief:** Plaintiff further seeks appropriate injunctive relief to restore his rights. This may include an injunction preventing the FTC and NAAG from enforcing or encouraging enforcement of the lifetime ban and other portions of the judgment against Plaintiff. It may also include an order preventing Defendants from engaging in future coordinated enforcement that lacks due process safeguards (for example, requiring that if the FTC/NAAG involve themselves in state enforcement, the targets must be given clear notice and an opportunity to be heard before any public condemnation). In essence, Plaintiff asks this Court to ensure that he and other small businesses are **not subjected to such unconstitutional tactics again**.

**Count III – Conspiracy to Violate Civil Rights (42 U.S.C. § 1985(3)):**

Separately, Plaintiff asserts a claim under 42 U.S.C. § 1985(3) for conspiracy to deprive him of civil rights. To prevail, Plaintiff must show (1) a conspiracy by two or more persons, (2) to deprive him of equal protection or equal privileges under the laws, (3) motivated by class-based animus (e.g. race or economic class), (4) causing injury to person or property, and (5) an overt act in furtherance of the conspiracy. These elements are met:

- **Conspirators Acting "Under Color" of Law:** The FTC (federal), NAAG (an association of state attorneys general), and Washington's Attorney General coordinated their efforts. NAAG explicitly acted as a channel for state enforcement, and the Washington AG participated in and enforced the injunction against Plaintiff. Each actor was performing law enforcement functions. A Bivens claim (federal officers) and a §1983 claim (state actors) both lie for constitutional violations here.

- **Class-Based Animus:** The conspiracy was at least motivated by class-based animus. Congress intended §1985(3) to cover conspiracies against protected classes (race, etc.) or against citizens enforcing rights. Here, Plaintiff is Latino and a minority veteran causes marketer; Defendants have targeted such small/minority businesses aggressively. Even if viewed as an anti-fraud effort, the unparalleled zeal and media campaign against Plaintiff personally suggests malice beyond a neutral enforcement.

By these actions, Defendants deprived Plaintiff of his right to equal treatment under the law and to pursue his chosen profession, all in furtherance of a class-based

conspiracy. Section 1985 thus provides an independent remedy (for conspiracy to violate rights) in addition to the direct §1983/Bivens claims.

- **Overt Acts Causing Harm:** Defendants publicly denounced Plaintiff's business ("fraud," "illegal"), obtained injunctions, and effectively shut down his operations. These acts foreseeably injured him: orders canceling website sales and press releases warning consumers directly interfered with his customer base. Each such act is an "overt act" under §1985.

45. Defendants conspired to deprive Plaintiff of constitutional rights through coordinated regulatory enforcement without due process or judicial scrutiny.

46. This conspiracy was motivated by political bias and intended to destroy Plaintiff's business and reputation.

47. Plaintiff re-alleges all foregoing paragraphs and further alleges that Defendants FTC and NAAG (acting through their officials and agents), together with Washington AG Bob Ferguson and possibly others, **conspired** to deprive Plaintiff of the equal protection of the laws and/or of equal privileges and immunities under the laws, in violation of 42 U.S.C. § 1985(3).

48. **Existence of a Conspiracy:** As detailed in the facts, there was an agreement and meeting of minds between the FTC (a federal actor) and NAAG (a collective of state actors) to target Plaintiff and similar parties through Operation Donate With Honor. This agreement included both lawful components (such as general consumer education) and unlawful components (such as the **intent to violate targets' rights** by rushing to punitive action and denying due process). The conspirators communicated and coordinated overt acts in furtherance of the conspiracy: e.g., sharing investigative information about Plaintiff, planning the

- 45 CIVIL COMPLAINT FOR DAMAGES

timing of press releases and filings, and uniformly branding Plaintiff as a fraudulent actor nationwide.

49. **Class-Based, Invidious Discrimination:** The conspiracy was motivated, at least in part, by an invidious discriminatory animus toward a protected class of which Plaintiff is a member. Specifically, Plaintiff is a minority (racial/ethnic minority) small-business owner. The enforcement pattern of Operation Donate With Honor reflected a bias (conscious or unconscious) against minority-operated organizations and those lacking political influence. Plaintiff was treated more harshly than others, and Defendants leveraged his minority status as an opportunity to present themselves as protecting a presumably vulnerable donor base from a so-called "bad actor." Additionally or alternatively, the conspiracy was driven by animus against those perceived as **critical of government actions** – Plaintiff had been vocal in defending his business practices (through lawsuits and communications), which painted a target on him. This animus is not a traditionally protected class like race; however, Plaintiff asserts that **minority entrepreneurs** can be considered a class subject to disparate treatment here, and that Defendants chose him partly because of that status, intending to make an example out of a small minority-run enterprise.

50. **Overt Acts:** In furtherance of the conspiracy, Defendants committed numerous overt acts, including but not limited to:

- Convening meetings or communications between FTC officials and NAAG representatives (and state AG staff) to discuss enforcement targets and strategies.

- Selecting Plaintiff's business as a target for the joint sweep, and exchanging information on Plaintiff's operations.

- FTC drafting or advising on the contents of the legal filings or press materials used by the Washington AG against Plaintiff.

- NAAG's Charities Committee possibly providing funding or resources to Washington for the case, and facilitating the coordination of the multi-state announcement on July 19, 2018, which included Plaintiff's matter.

- Simultaneously publishing defamatory press releases accusing Plaintiff of fraud (by the Washington AG, blessed by NAAG/FTC coordination).
- Encouraging the pursuit of maximum penalties (e.g., lifetime bans, high fines) against Plaintiff, and discouraging any settlement or leniency, to ensure Plaintiff would be crushed by the outcome.

- Agreeing not to provide Plaintiff any meaningful chance to explain or rectify issues before litigation, thus ensuring that the outcome (default and judgment) was secured in line with the conspirators' objectives.

49. **Resulting Deprivation of Rights:** The conspiracy succeeded in its aim to deprive Plaintiff of his rights. Plaintiff was denied equal protection of the laws in that he was treated in a markedly more punitive way than others; he was denied the protection of fair procedures that the law affords. The concerted actions resulted in the violations of First Amendment, due process, and other rights as already enumerated. This combined effort magnified the harm to Plaintiff beyond what

any actor could have done alone, showing the power of their conspiracy to injure him.

50. **Liability of Defendants:** Both the FTC and NAAG (and their personnel) are liable under 42 U.S.C. § 1985(3). Although § 1985(3) typically speaks to persons conspiring, here the **individual officers** of the FTC and NAAG members formed the conspiracy. The FTC can be held responsible to the extent its **agents** participated (even if an agency itself is not usually sued under § 1985, Plaintiff seeks to sue the agency as an organizational representative of those agents). NAAG is directly suable as an entity that acted through its officials in coordinating with the FTC. Neither the FTC nor NAAG is a protected entity immune from § 1985 liability: the FTC's involvement is outside the scope of its authority (violating rights is not authorized by law), and NAAG is a private association for these purposes. Importantly, state officials like the Washington AG who participated did so in **clear excess of their authority by conspiring with federal actors to violate rights**, removing any immunities they might claim.

51. **Injury and Damages:** As a proximate result of the conspiracy, Plaintiff suffered all the harms previously described – loss of property, business, reputation, and rights. Under § 1985(3), Plaintiff is entitled to recover damages from the conspirators for these deprivations. Plaintiff seeks **compensatory damages** jointly and severally from Defendants for his losses. Additionally, because this conspiracy was malicious and exhibited reckless indifference to Plaintiff's rights, Plaintiff seeks **punitive damages** against the individual conspirators (to the extent allowed against those actors – for example, punitive damages are available against individuals in Bivens and § 1983 suits).

52. **Attorney Fees:** Furthermore, pursuant to 42 U.S.C. § 1988(b), if Plaintiff prevails on his § 1985 (or § 1983) claims, he is entitled to an award of reasonable attorney's fees. (Although Plaintiff is currently pro se, he reserves the right to seek legal representation, and in any event, seeks to recover the value of legal efforts required to vindicate his civil rights.)

**Count IV – Unconstitutional Application of Washington Consumer Protection Act (RCW 19.86) and Related Laws (Declaratory/Injunctive Relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201)**

Plaintiff also challenges the application of state statutes themselves as unconstitutionally vague, overbroad, or otherwise violative of due process and free speech. The CPA (RCW 19.86) and Charitable Solicitations Act (CSA, RCW 19.09) allow the State to punish "deceptive" or unregistered charitable fundraising. But these laws must be applied with precision. Here:

- **Due Process – Vagueness:** The CPA's ban on "unfair or deceptive acts" is standard in Washington, but it cannot be used arbitrarily. A statute is void for vagueness if "a person of ordinary intelligence" cannot reasonably know what conduct it prohibits. Plaintiff's conduct (selling bracelets and donating some proceeds) had never been specifically regulated or clearly outlawed. Defendants treated nearly every charitable statement as a CPA violation, without any concrete standard. A businessperson in Plaintiff's position could not predict that allowing customers to make charitable donations (via product purchases) would trigger litigation. In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), the Supreme Court warned that laws criminalizing fraud must

1  give fair notice. Here, the State's ad hoc approach failed to provide that notice,

2  violating due process.

3

4  • **Overbreadth and First Amendment:** As noted, charitable solicitation implicates

5  speech. Washington law requires that solicitations not mislead the public, but also

6  acknowledges the right of for-profit fundraisers to communicate. *Value Village*

7  held that the State's enforcement – which targeted marketing materials – ran afoul

8  of the Constitution. By analogy, the CSA's registration and disclosure

9  requirements, and the CPA's fraud remedial provisions (like asset forfeiture or

10  business bans), must be applied in a manner that does not snuff out valid speech.

11  The blanket bans here (preventing Plaintiff from any future charities-related

12  commerce) went far beyond what the statutes expressly authorize. These laws, as

13  enforced, are overbroad – they sweep in lawful charitable appeals and cause-

14  related marketing, burdensome to more speech than necessary.

15

16  • **Lack of Mens Rea:** Washington's CPA historically did not require a showing of

17  intent to defraud; however, the First Amendment has sometimes been read to

18  demand scienter in fraud cases (see *Riley*, 487 U.S. at 800 n.9). If a public agent

19  brands speech as "deceptive," at minimum there must be proof the speaker

20  knowingly lied. Plaintiff's fundraising claims (that some proceeds *would* aid

21  veterans) were honestly held aspirations. There is no evidence he knew them to be

22  false. The State's insistence on punishing him despite this absence of bad faith

23  violates the due process requirement of fair notice.

24

25  In sum, the statutory scheme cannot constitutionally be used to ban Plaintiff's

26  business and speech in the wholesale manner Defendants have done. Washington law

27  requires narrow tailoring and due process in charity regulation, which was absent here.

28

- 50 CIVIL COMPLAINT FOR DAMAGES

53. The State of Washington and its officials enforced the Washington Consumer Protection Act in a discriminatory, arbitrary, and politically biased manner.

54. Enforcement actions disproportionately targeted Republican and minority business owners.

55. The statute, as applied, has enabled unconstitutional conduct by state officials.

56. Plaintiff re-alleges the prior paragraphs and specifically challenges the **constitutionality of the Washington Consumer Protection Act ("CPA") and related Charitable Solicitations Act ("CSA") as applied to his case** and similar enforcement actions. This count is brought against Defendant NAAG (and its members, including the Washington AG) under 42 U.S.C. § 1983, as they were acting under color of state law in enforcing those statutes, and against Defendant FTC to the extent it enabled the enforcement. Plaintiff seeks declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and 42 U.S.C. § 1983 (for the deprivation of rights under color of state law). Furthermore, Plaintiff relies on the State of Washington v. Value Village case to support all of his arguments. Value Village was fortunate enough to have been able to afford a litigator to help them against the very same false allegations made against the Plaintiff, and Value Village succeeded in defeating the State of Washington's false allegations against them.

54. **Nature of Challenge:** Plaintiff does not per se challenge the facial validity of the CPA (RCW 19.86) or the Charitable Solicitations Act (RCW 19.09) in their entirety; rather, he challenges these statutes **as applied** to him and similarly

situated entities, on the grounds that their application was unconstitutional. In particular:

- The **CPA's broad prohibition of "unfair or deceptive" acts was applied to penalize Plaintiff's speech and conduct without requiring proof of Plaintiff's intent to deceive or proof of material harm to consumers. This loose application infringed on Plaintiff's First Amendment rights (commercial speech and charitable solicitation speech), effectively punishing potentially protected speech (charitable solicitation tied to product sales) as though it were fraud. The First Amendment requires that charitable solicitation regulations be narrowly tailored and that any fraud statutes require a showing of knowing misrepresentation. Here, the CPA was used in a manner that did not satisfy those standards.

- The **combination of CPA and CSA** was used to impose onerous requirements and ultimately bans on Plaintiff's participation in commerce. The CSA required certain disclosures and truthful representations in charitable solicitations. Plaintiff contends that he substantially complied or at least did not willfully violate these requirements, but the State (with Defendants' support) applied the CSA strictly and without flexibility, again without a proper hearing. The **penalties and remedies** (like the business ban and huge fines) are not authorized explicitly by statute to that extreme degree, and thus their imposition relied on broadly interpreting the CPA's remedial provisions. This broad interpretation, as applied, is unconstitutionally vague and overbroad.

- The **as-applied vagueness:** Plaintiff could not have reasonably known that his activities (operating a business that sells goods and plans to donate some profits) would be deemed subject to charitable solicitation law or considered "unfair or

deceptive" to the tune of 1,240 separate violations. The lack of clear standards in the CPA allowed Defendants to arbitrarily tag each sale or statement as a separate violation. A law that is so broad that it allows such arbitrary enforcement violates due process. The chilling effect is that a person of ordinary intelligence would be afraid to engage in any cause-related commerce, not knowing what might later be considered "deceptive" by the state.

- **Overbreadth:** The injunctive relief entered (barring Plaintiff from all charity and much commercial conduct) demonstrates the elasticity with which the CPA was applied – extending beyond fraudulent solicitations to all manner of future conduct. This is overbreadth that impacts more speech than necessary to achieve any legitimate aim and thus violates the First Amendment.

55. **Declaratory Relief Sought:** Plaintiff seeks a declaratory judgment that the enforcement of the CPA (and CSA) against him was unconstitutional. Specifically, Plaintiff requests the Court declare that:

- The permanent injunctive relief imposed under color of the CPA (the ban on Plaintiff forming or operating businesses and charities) violates the First Amendment and the Due Process Clause, and is void or unenforceable.

- The manner in which Defendants calculated and imposed penalties (treating each instance as a separate violation) without specific statutory guidance was unconstitutionally excessive and violated Plaintiff's due process rights.

- The CPA and CSA, as applied to prohibit Plaintiff from making **charitable solicitation statements in connection with sales**, violated Plaintiff's free speech

rights because less restrictive means (like requiring truthfulness or monitoring future actual donations) were available.

- Any provision of the CPA or CSA that purports to authorize the type of broad ban imposed on Plaintiff is unconstitutional as applied, because it operates as a punitive sanction on speech and livelihood without the necessary safeguards of a criminal proceeding (e.g., beyond a reasonable doubt standard, which was not present in the civil case).

- Overall, that Defendants' use of these laws against Plaintiff was an abuse of legal process that the Constitution cannot tolerate.

56. **Injunctive Relief Sought:** In connection with this declaratory relief, Plaintiff asks for a permanent injunction prohibiting Defendants and their officers:

- From enforcing the specific injunctive terms of the state court judgment against Plaintiff (i.e., the lifetime ban on business and charity involvement), on the ground that it is unconstitutional. This would prevent the Washington Attorney General (or any state actor) from attempting to enforce those provisions, and similarly prevent the FTC/NAAG from requesting or promoting such relief in other cases.

- From including Plaintiff's name or the names of his businesses on any list or publication that suggests he is barred from charitable activities (for example, if NAAG or NASCO maintain databases of banned solicitors, Plaintiff seeks to be removed from such lists, since the ban was unconstitutionally obtained).

- From initiating any new enforcement action against Plaintiff based on the same underlying conduct, under either state or federal law, as such re-prosecution would be fundamentally unfair (and perhaps double jeopardy in spirit, though not criminal).

- Generally, an injunction requiring that if Defendants pursue consumer protection enforcement in the context of charitable solicitations in the future, they must do so in a manner consistent with constitutional requirements – which could include providing targets an opportunity to cure any misleading statements, requiring proof of intentional deception for severe penalties, and refraining from public condemnation until after adjudication.

57. Plaintiff is not asking this Court to overturn the state court judgment as an appellate matter, but rather to **prospectively relieve** him from the unconstitutional effects of that judgment and to restrain Defendants from continuing or repeating their unconstitutional conduct. The relief sought is necessary to restore Plaintiff's rights and to ensure that Defendants do not similarly abuse the CPA or related laws against others.

**Count V – Tortious Interference with Business Relations (State Law Tort Claim – Brought under FTCA against the United States for FTC's actions, and directly against NAAG):**

Under Washington law, a plaintiff may recover for intentional interference with business relationships by proving: (1) the existence of a valid business expectancy or relationship; (2) the defendant's knowledge of the expectancy; (3) intentional interference

by the defendant inducing or causing a breach or termination of the expectancy; (4) an improper or wrongful act by the defendant; and (5) resultant damages. Here:

- **Business Expectancies:** Plaintiff had ongoing relationships with customers who expected to buy bracelets benefiting veterans, with donors interested in funding his cause, and with vendors who supplied merchandise. He built goodwill over years of service to military families.

- **Knowledge and Intent:** Defendants knew of these expectancies. They specifically targeted Plaintiff's operations as part of a campaign. Public statements and legal actions were aimed at destroying trust in his business. For example, FTC/NAAG press releases warned consumers not to trust Fallen Hero Bracelets, directly cutting off sales. The injunctions froze his website and assets, preventing fulfillment of orders. Each act was calculated to sever his business ties.

- **Improper Means:** These interventions were done through wrongful means (abuse of legal process, public defamation, government pressure). Washington courts have held that even lawful acts can be wrongful if the motive is solely to injure and the means "improper" (e.g. violation of a statute or use of baseless legal process). Here, deploying a government "crackdown" to muzzle one businessman far exceeds any legitimate regulatory action.

- **Damages:** Plaintiff suffered devastating losses: total loss of business, destroyed customer goodwill, lost profits and investments. The default injunctions barred him from transacting his business in Washington, causing millions in lost revenue (the complaint cites catastrophic figures). These are exactly the pecuniary harms that tortious interference seeks to remedy.

58. Plaintiff had valid and ongoing **business relationships and expectancies** with customers, donors, and partners through his company Fallen Hero Bracelets, LLC and related ventures. These relationships included:

Because the U.S. waived sovereign immunity under the FTCA for state-law torts (28 U.S.C. §1346(b)), Plaintiff can hold the FTC liable for its role. NAAG's member states (like Washington) have no immunity for such concerted misconduct. Plaintiff's allegations meet the elements of tortious interference and warrant compensatory and punitive damages.

- Relationships with customers who purchased products from FHB, expecting to receive merchandise and also expecting that part of their payment would support a charitable cause.

- Relationships with potential donors or sponsors who were interested in supporting Plaintiff's mission of honoring fallen soldiers (some individuals might have been repeat customers or had discussions with Plaintiff about contributing larger support).

- Business relationships with suppliers or vendors who worked with Plaintiff to produce bracelets and other merchandise, relying on the continued operation of his business.

- The general goodwill of the military and veteran community, which constituted an advantageous business expectancy for Plaintiff to continue operations.

59. Defendants **knew of Plaintiff's business relationships and expectancies**. The FTC and NAAG specifically identified Plaintiff's operations in order to disrupt them — they knew that by publicly accusing Plaintiff of being a sham and obtaining legal orders against him, customers would stop doing business with Plaintiff and suppliers would cut ties. The entire aim of Operation Donate With Honor, as applied to Plaintiff, was to halt his business activities, which by definition meant interfering with his relationships with customers and the public.

60. Defendants **intentionally interfered** with these relationships and expectancies. Their actions were not mere coincidence or incidental impact; rather, Defendants **willfully orchestrated a campaign** to sever the bond between Plaintiff and his customer base. Examples of intentional interference include:

- The publication of press releases and public statements by Defendants (or their co-conspirators) warning consumers about Plaintiff's business, effectively telling the public "do not trust or do business with Fallen Hero Bracelets." This caused consumers to cancel orders, request refunds, or avoid purchasing altogether.

- The procurement of court orders that shut down Plaintiff's website (directly or indirectly) and mandated the cessation of certain business practices. This cut off Plaintiff's ability to fulfill existing orders or attract new customers.

- Communicating with platforms or agencies (potentially the Better Business Bureau, or other charity watchdog organizations) about Plaintiff in a way that led to negative reports or de-listing of Plaintiff's business, thereby drying up referrals and goodwill. (For instance, the Washington AG's press release noted FHB had an

"F" rating with the Better Business Bureau, something likely publicized during the operation, further driving away customers.)

61. The Defendants' interference was conducted through **wrongful means**. While law enforcement actions can be legitimate, here Defendants' means were wrongful because they involved **constitutional violations, defamation, and misuse of authority**. The press releases contained false or misleading statements (defamation). The legal process was abused (malicious prosecution/abuse of process) as a tool to harm Plaintiff rather than to legitimately enforce the law. Additionally, the interference was motivated by ill intent – to punish and ruin Plaintiff rather than simply to stop deceptive advertising. These constitute improper means under tort law, as they violate established legal standards and duties.

62. As a result of Defendants' intentional and improper interference, Plaintiff's business relationships were **disrupted and destroyed**. Customers demanded chargebacks or refunds en masse following the negative publicity, and new sales dried up, causing loss of revenue. Potential donors or supporters distanced themselves. Suppliers likely ceased doing business with Plaintiff due to the uncertainty and taint surrounding his operations. In short, Plaintiff's business expectancies—ongoing sales and future growth—collapsed.

63. Plaintiff suffered **damages** from this interference. These include lost profits from sales that were canceled or that never occurred, lost business opportunities (such as potential partnerships or expansion plans that were derailed), and loss of the going-concern value of his businesses. Plaintiff estimates these economic losses to be substantial – given that FHB had advertised making "over 1.2 million sales

worldwide" (an assertion now disputed by Defendants), even the shutdown of operations for a short time could plausibly account for hundreds of thousands of dollars in lost revenue. The permanent destruction of the business arguably cost Plaintiff millions in future earning potential. Additionally, Plaintiff suffered reputational damage which, though a non-economic harm, has economic consequences in loss of employability and goodwill (these consequences can be considered under general damages for tortious interference as harm to reputation in business).

64. **FTCA Aspect (FTC/United States):** To the extent that FTC officials or agents committed the above tortious acts within the scope of their employment (for example, an FTC official drafting a defamatory press release or advising the AG in a manner that constitutes abuse of process), the United States is vicariously liable for tortious interference under the Federal Tort Claims Act. Plaintiff has met the FTCA's requirements as noted (administrative claim filed, etc.). No FTCA exception bars this claim because the actions described can be characterized as **abuse of process or malicious prosecution** (in pursuing a wrongful legal action) which are torts potentially within the FTCA's waiver when committed by investigative or law enforcement officers. To the extent any portion of the claim falls under an exception (e.g., defamation is excepted), Plaintiff pleads this count in the alternative as either within FTCA coverage or as independent wrongdoing by NAAG addressed below.

65. **NAAG Liability:** NAAG is liable for tortious interference either directly or under a theory of concerted action. NAAG, through its employees or agents, intentionally induced or encouraged the breach of Plaintiff's relationships (e.g., NAAG personnel coordinating with state AGs on messaging that harmed

Plaintiff's customer relations). NAAG cannot claim a privilege to interfere because the means were unconstitutional and malicious. If NAAG argues it was simply assisting law enforcement, Plaintiff counters that NAAG stepped outside any privilege by engaging in a campaign of vilification not grounded in fair or truthful proceedings.

66. **Punitive/Exemplary Damages:** Plaintiff seeks punitive damages for tortious interference to the extent allowable (punitive damages are not allowed against the United States under FTCA, but could be sought against NAAG or individuals involved under state law). Defendants' conduct was willful and wanton, justifying punitive damages to punish the interference with Plaintiff's business and deter similar conduct against others.

67. **Damages Summary (Tortious Interference):** Plaintiff seeks to recover all actual damages flowing from the collapse of his business and loss of income, in an amount to be proven at trial. Given the scale of Plaintiff's business and the complete destruction caused, these damages are believed to be in the tens of millions of dollars or more. Plaintiff also seeks any appropriate equitable relief, such as an injunction against Defendants from continuing to interfere with any future business endeavors by Plaintiff (for instance, to prevent them from informally blacklisting Plaintiff in any industry circles).

**Count VI – Defamation (Libel and Slander) (State Law Tort – FTCA against United States for FTC's role; direct against NAAG):**

Defendants also defamed Plaintiff by publishing false statements that ruined his reputation. In Washington, a plaintiff must prove a false and unprivileged statement of fact about him, that was made with at least negligence, published to a third party, and caused injury. Here:

- **False Statements of Fact:** The State and FTC publicly characterized Plaintiff's business as an "illegal sham charity" and said it "provided no funds to veterans," calling his conduct "deceptive" and "disrespectful". These specific assertions are demonstrably false: Plaintiff's business model promised veteran benefits (even if unfulfilled), and at no time was he a registered charity, etc. Calling lawful conduct "illegal" is a factual assertion, not opinion.

- **Publication and Fault:** These statements were widely disseminated via press releases, court filings, and media coverage in concert with the enforcement campaign. They were made or endorsed by government officials and FBI/FTC announcements. At minimum, they were made recklessly without verifying facts, satisfying the fault requirement for a private figure (Plaintiff is not a public official). If Plaintiff is deemed a public figure due to media attention, he easily meets the higher "actual malice" standard, as Defendants knowingly advanced falsehoods to carry out the policy agenda.

- **Injury:** The complaint documents how these statements directly caused loss of customers and industry standing. Consumers cancelled orders and suppliers cut ties upon hearing the allegations. As a result, Plaintiff's business collapsed and his reputation in the veterans' community was irreparably harmed.

No privilege protects these communications. Government officials have qualified immunity for actions within scope of duties, but that immunity does not shield malicious defamation. Nor is any retraction offered. Plaintiff is entitled to tort damages for the reputational harm and emotional distress these false public pronouncements caused.

68. Defendants (and their agents) made numerous **false and defamatory statements** about Plaintiff and his businesses, both in writing (libel) and orally (slander). These statements include, but are not limited to:

- Accusations that Plaintiff and Fallen Hero Bracelets were a "sham charity," implying fraudulent intent and dishonesty.

- Statements that Plaintiff's conduct was "illegal," "deceptive," and "abusive," stated as facts in official press releases and court filings disseminated to the media.

- The assertion that Plaintiff "falsely held himself out as a military veteran" (as noted in the Washington AG's November 6, 2020 press release and court order). Plaintiff contends this is false – he did not misrepresent his veteran status in any way that would justify that claim; Defendants publicized this damaging allegation without evidence or context.

- Claims that "none of the money raised" by Plaintiff's business went to veterans or charities, effectively labeling Plaintiff a thief or fraud who pocketed all donations. Plaintiff asserts that this is a misleading statement: while he acknowledges delays and difficulties in disbursing funds due to business struggles, he maintained intentions to donate and did not personally enrich himself extravagantly from these sales. Moreover, such a sweeping statement ignores the value delivered in goods

and the other ways Plaintiff supported veteran causes (e.g., raising awareness). By suggesting Plaintiff outright lied and stole under false pretenses, Defendants defamed him in his trade and profession.

- The implication that Plaintiff created a fake entity "Business Bureau of America" and lied about an A+ rating (as per the AG's press statements). Even if Plaintiff did use a misleading logo, the way Defendants publicized this was calculated to maximumly embarrass him and portray him as unethical. The gist of the publications was to portray Plaintiff as a con man of the lowest order.

69. These defamatory statements were **published** widely. The Washington Attorney General's press releases are public documents available on the internet and were picked up by news outlets (including local and national news). NAAG and FTC likely shared information with other agencies and perhaps in conferences, further spreading these claims among professional circles and the public. FTC's participation in the national press conference on July 19, 2018, where various targets were discussed (possibly including Plaintiff by reference) spread the message that Plaintiff was among "scam charities." NAAG possibly published newsletters or updates to its members referencing the Washington action against Plaintiff, repeating the defamatory characterizations.

70. The statements in question were made **with actual malice or, at minimum, with negligence** regarding their truth:

- Defendants knew or should have known that labeling Plaintiff's business a complete sham was an overstatement. By July 2018, Plaintiff's operation had genuine elements: real products were sold and delivered (albeit with some delays),

and there was still a possibility of charitable contributions forthcoming. The categorical statement that Plaintiff did "none" of what he promised is disputable, and Defendants did not wait to verify through a trial – they preferred a sensational claim.

- Defendants had **obvious reasons to doubt** the veracity of some of their statements. For instance, claiming Plaintiff posed as a veteran – if this was gleaned from Plaintiff perhaps wearing military-style apparel or using patriotic language, it's not the same as an outright false claim of service. Without a clear source for that accusation, its inclusion indicates reckless disregard for truth.

- The manner in which the statements were made (in the heat of a coordinated sweep, to garner public attention) shows Defendants prioritized impact over accuracy. This satisfies the standard of actual malice (knowledge or reckless disregard of falsity) if Plaintiff is considered a public figure or limited-purpose public figure due to involvement in a public controversy. Even if considered a private individual, Defendants at least were negligent by not exercising due care to ensure truthfulness before irreparably tarnishing Plaintiff.

71. The defamatory statements are **not protected by privilege**. While statements made in court filings are privileged to some extent, Defendants went beyond the courtroom to the press and public statements. The Washington AG's press releases, though relating to a legal case, were not necessary for the prosecution of that case; they were extrajudicial comments. Any claim of an "official duty" privilege is negated by the malice and the extrajudicial nature of the remarks. FTC and NAAG officials are not protected when they step into a role of publicity and defamation outside formal legal proceedings. Moreover, even within the context of

the lawsuit, the Defendants abused the process to broadcast defamatory claims knowing Plaintiff had not had a chance to contest them.

72. **Injury to Plaintiff's Reputation:** The defamatory statements have caused severe injury to Plaintiff's personal and professional reputation, as detailed earlier. He has been exposed to hatred, contempt, ridicule, and obloquy in the community. Many members of the public view him as a scam artist unworthy of trust or respect. This has not only emotional consequences but also career and financial consequences; no one wants to do business with someone who has been branded in this manner by high-profile officials.

73. **Per se Defamation:** Many of the statements constitute defamation per se under Washington law (and generally). They impugn Plaintiff's professional integrity and accuse him of serious misconduct (fraud, dishonesty in business) – thus, damages to reputation are presumed. Also, accusing someone of illegal or criminal behavior (fraud, essentially theft by deception) is classic defamation per se. Therefore, Plaintiff does not need to prove special damages to recover for these statements, though he has in fact suffered economic harm as well.

74. **FTCA and NAAG Liability:** To the extent FTC personnel made or contributed to defamatory statements within their employment (for example, preparing talking points, or an FTC press release or providing quotes from FTC officials about the operation that lumped Plaintiff in with "con artists"), the United States is liable for libel/slander under FTCA *unless* the intentional tort exception applies. Plaintiff acknowledges that 28 U.S.C. § 2680(h) generally excludes claims for libel and slander. However, Plaintiff pleads that the defamatory acts here were part of an **abuse of process or malicious prosecution** orchestrated by "investigative or law

enforcement officers" (FTC being a law enforcement agency). If the Court finds the FTCA cannot cover defamation due to the exception, Plaintiff nonetheless seeks to hold NAAG and possibly individual actors liable directly. NAAG can be liable for republication or conspiring in the defamation (civil conspiracy under state law to defame, for example, if multiple parties agreed to spread false claims). The Court has supplemental jurisdiction to adjudicate a state law defamation claim against NAAG alongside the federal claims.

75. **Damages:** Plaintiff seeks substantial damages for defamation. The reputational harm is nationwide and enduring. A rough estimate for the value of Plaintiff's reputation and the harm caused easily reaches into the **millions of dollars**, considering he has essentially been rendered persona non grata in the charity and business communities. Plaintiff also seeks punitive damages on the defamation claim (against NAAG or individuals, since punitive damages are not available against the U.S. under FTCA) because the conduct was malicious.

76. Additionally, Plaintiff requests the Court to order appropriate **retractions or corrections**. As equitable relief incidental to the defamation claim, the Court could compel Defendants to issue retractions or clarifications of their statements, to mitigate ongoing harm. For instance, requiring NAAG to communicate to its members that the judgment against Plaintiff was obtained by default and that no court actually found intentional fraud after a trial – simple truths that would correct the impression given. Similarly, requiring the FTC to remove or amend any references to Plaintiff in its public-facing materials on Operation Donate With Honor, to note that Plaintiff disputes the allegations and that this matter is under review for constitutional violations.

**VI. Washington State v. Value Village (TVI, Inc.) – Authoritative Precedent**

Plaintiff can rely heavily on *State v. TVI, Inc.* (2023), in which Washington's highest court vindicated a for-profit business's First Amendment rights in a virtually identical context. There, Value Village's in-store signs and solicitations invited charitable donations; the State sued under the CPA and CSA. The Washington Supreme Court held that the State's marketing-based CPA claims impermissibly burdened Value Village's protected speech. Importantly, the opinion acknowledges that Value Village did *not* falsely advertise itself as a nonprofit or donate proceeds; rather it transparently partnered with charities. Still, the court found the State's regulation of its speech unconstitutional and remanded for dismissal. Plaintiff's case is on all fours with *Value Village*: like TVI, Plaintiff sold donated goods to the public via charity partners, used charitable imagery, and promised benefits to nonprofits. The State could have required registration or disclosures (as it did with Value Village), but it chose instead to proclaim the business "deceptive" and bar its operations outright. *Value Village* expressly forbids punishing that kind of speech-based conduct under the CPA. This case thus provides a binding, contemporary blueprint: any claim that Plaintiff "deceived" consumers by his marketing must be dismissed for violating the First Amendment.

**VII. RELIEF SOUGHT:**

Given these violations, Plaintiff is entitled to both injunctive and monetary relief. An injunction should vacate the default judgment and business ban insofar as they interfere with his speech and commercial activities. Damages include lost profits, lost goodwill, attorney's fees, and for constitutional torts, qualified immunity does not apply to constitutional violations. Punitive damages are appropriate for the willful and malicious nature of Defendants' coordinated misconduct.

**Conclusion:** Taken together, the facts and law overwhelmingly support Plaintiff. Defendants cannot lawfully label his honest cause-related business a crime in order to silence it. Binding precedent (*Value Village*, *Riley*, etc.) and constitutional doctrine require that his speech and due process rights be protected, not punished. All of Plaintiff's claims – First and Fourth Amendment, due process, civil rights conspiracies, and torts – have solid legal foundation. He is entitled to vindicate those rights through relief under 42 U.S.C. §§1983, 1985, the FTCA, and Washington law, as outlined above. Plaintiff's Complaint raises well-supported claims under federal and Washington law. Each element – from deprivation of constitutional rights to business torts – is backed by authority. Notably, *State v. TVI, Inc.* confirms that targeting a charitable enterprise under Washington's CPA/CSA without strict compliance is unconstitutional. Defendants' concerted actions here – preemptive court orders, coordinated press attacks, and denial of basic due process – violated the First, Fourth, Fifth and Fourteenth Amendments and state tort law. For these reasons, all causes of action should be sustained and Plaintiff awarded relief.

1. **Compensatory Damages:** An award of compensatory damages in the amount of *$100,000,000,000 (One Hundred Billion Dollars)*, or an amount to be proven at trial, for all injuries suffered by Plaintiff. This figure includes, but is not limited to:

   o Economic losses from the Plaintiff's loss of income (past and future); to include the loss of access to a graduate program at Pacific Lutheran University, which was rescinded based upon the actions of the Defendants, and a career-level teaching position that was terminated in 2025.

   o Damage to Plaintiff's reputation and loss of earning capacity;

o   Emotional distress, pain and suffering, and mental anguish suffered as a result of Defendants' actions;

o   Out-of-pocket expenses and consequential damages stemming from Defendants' conduct (such as costs incurred due to the legal action, medical exacerbation costs, etc.).

*This unusually high demand for damages reflects the egregious nature of Defendants' conduct and the broad scope of harm inflicted — essentially wiping out Plaintiff's livelihood and violating fundamental rights. Plaintiff will seek to quantify these damages with more precision in the course of this litigation, but asserts that the value of the rights and business destroyed, plus the need for deterrence, warrants a substantial award.*

2.  **Punitive Damages:** An award of punitive and exemplary damages against the appropriate Defendants, in an amount sufficient to punish them and deter similar conduct. Plaintiff specifically seeks punitive damages against:

o   Individual federal agents of the FTC responsible for the constitutional violations (under Bivens claims), to the extent permitted by law;

o   NAAG and/or its officials in their individual capacities (under § 1983 or state law claims) for their willful and malicious conduct;

o   The amount of punitive damages should be commensurate with Defendants' wealth and the outrageousness of their conduct — Plaintiff suggests a punitive award in the realm of hundreds of millions of dollars,

subject to proof, to send a clear message that governmental agencies and associations must not trample the rights of citizens.

3. **Declaratory Relief:** A declaratory judgment pursuant to 28 U.S.C. § 2201 declaring the actions of the Defendants to be unconstitutional and unlawful. Specifically:

   o Declare that Defendants' conduct in investigating, publicizing, and prosecuting Plaintiff as part of Operation Donate With Honor violated Plaintiff's First Amendment rights (free speech and petition), Fifth and Fourteenth Amendment rights (due process and equal protection), and civil rights under 42 U.S.C. §§ 1983 and 1985.

   o Declare that the Washington Consumer Protection Act and Charitable Solicitations Act were applied to Plaintiff in an unconstitutional manner, and that the resulting state court injunction and business prohibitions are unenforceable due to these constitutional defects.

   o Declare that Defendants engaged in a civil conspiracy to deprive Plaintiff of his rights.

   o Declare that the defamatory statements made by Defendants about Plaintiff were false and not supported by adjudicated facts, thereby restoring (to the extent a declaration can) Plaintiff's good name.

4. **Injunctive Relief:** A permanent injunction prohibiting Defendants, along with their officers, agents, employees, and all persons in active concert or participation

with them, from engaging in the unlawful conduct described, including but not limited to:

- o **Enforcement Injunction:** Enjoining the FTC and NAAG from further implementing or coordinating any enforcement action against Plaintiff or similarly situated small businesses in a manner that violates constitutional rights. This includes enjoining any further "Operation Donate With Honor" style campaigns that do not afford targets due process and respect First Amendment limits. In practical terms, Defendants should be restrained from continuing any enforcement or collection of the state court judgment against Plaintiff (such as attempting to collect fines or enforce the business ban through any means).

- o **Vacatur/Modification of State Injunction:** Ordering Defendants to take all necessary steps to vacate or set aside the permanent injunction entered against Plaintiff in the state court, or at least to cease enforcement of it. If direct vacatur by this Court is not feasible, then ordering FTC and NAAG to formally request the state court to vacate or modify the injunction in light of constitutional issues (as part of a consent or settlement).

- o **Clearing Plaintiff's Record:** Requiring Defendants to remove Plaintiff from any inter-agency lists of banned solicitors or fraud alerts, and to issue notices to relevant agencies (e.g., state charity regulators outside Washington, the FTC's own databases, etc.) that any prior findings against Plaintiff are under dispute and should not be considered conclusive.

o **Future Conduct Reforms:** Enjoining Defendants from publishing accusations against targets of consumer protection enforcement before such targets have had a chance for a hearing. For instance, prohibit FTC and NAAG from issuing press releases calling someone a scam or sham in conjunction with filing a complaint; they must at least label it as "alleged" and not assert guilt until proven. While this might be broad, it is aimed at preventing the exact reputational harm that befell Plaintiff absent due process.

5. **Attorney's Fees and Costs:** An award to Plaintiff of his costs of suit, and because he is litigating civil rights claims, an award of reasonable attorney's fees under 42 U.S.C. § 1988 (should Plaintiff retain counsel or for the value of his pro se time as allowed by law). Even as a pro se, Plaintiff has expended resources and is entitled to recover costs such as filing fees, postage, and other litigation expenses. If Plaintiff later secures representation, those fees should be compensable if he prevails.

6. **Any Further Relief Deemed Just and Proper:** Such other and further relief as the Court deems just, equitable, and proper. This catch-all would include, for example, any needed relief to restore Plaintiff's business operations (perhaps supervision of Defendants if they resist compliance, or referral for disciplinary action if appropriate for any officials who egregiously violated ethical rules). Plaintiff also welcomes structural relief, such as the Court ordering Defendants to undergo training or policy changes to prevent future constitutional violations.

**JURY DEMAND:** Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to the Seventh Amendment to the U.S. Constitution and Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted this 19th day of November, 2025.

Michael Friedmann
*Pro Se*

- 74 CIVIL COMPLAINT FOR DAMAGES